## UNITED STATES *v.* LEE.

## KAUFMAN *v.* LEE.

1. The doctrine that, except where Congress has provided, the United States cannot be sued, examined and reaffirmed.
2. That doctrine has no application to officers and agents of the United States who, when as such holding for public uses possession of property, are sued therefor by a person claiming to be the owner thereof or entitled thereto; but the lawfulness of that possession and the right or title of the United States to the property may, by a court of competent jurisdiction, be the subject-matter of inquiry, and adjudged accordingly.
3. The constitutional provisions that no person shall be deprived of life, liberty, or property without due process of law, nor private property taken for public use without just compensation, relate to those rights whose protection is peculiarly within the province of the judicial branch of the government. Cases examined which show that the courts extend protection when the rights of property are unlawfully invaded by public officers.
4. In ejectment, the title relied on by the defence was a certificate of sale of the demanded premises to the United States by the commissioners under the act of Congress for the collection of direct taxes. The certificate was impeached on the ground of the refusal of the commissioners to permit the owner to pay the tax, with interest and costs, before the day of sale, by an agent, or in any other way than by payment in person. *Held,* that when the commissioners had established a uniform rule that they would receive such taxes from no one but the owner in person, it avoids such sale, and a tender is unnecessary, since it would be of no avail.
5. *Bennett* v. *Hunter*, 9 Wall. 324, *Tacey* v. *Irwin*, 18 id. 549, and *Atwood* v. *Weems*, 99 U. S. 183, re-examined, and the principle they establish held to apply to a purchase at such a tax sale by the United States as well as by a private person.

ERROR to the Circuit Court of the United States for the Eastern District of Virginia.

The facts are stated in the opinion of the court.

The cases were argued by the *Solicitor-General* and *Mr. Westell Willoughby* for the plaintiffs in error, and by *Mr. William D. Shipman*, *Mr. A. Ferguson Beach*, and *Mr. William J. Robertson*, with whom were *Mr. Legh R. Page* and *Mr. Francis L. Smith*, for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

These are two writs of error to the same judgment: one prosecuted by the United States, *eo nomine;* and the other by the

Attorney-General of the United States, in the names of Frederick Kaufman and Richard P. Strong, the defendants against whom judgment was rendered in the Circuit Court.

The action was originally commenced in the Circuit Court for the county of Alexandria, in the State of Virginia, by George W. P. C. Lee, against Kaufman and Strong and a great number of others, to recover possession of a parcel of land of about eleven hundred acres, known as the Arlington estate. It was in the form prescribed by the statutes of Virginia, under which the pleadings are in the names of the real parties, plaintiff and defendant.

As soon as the declaration was filed the case was, by writ of *certiorari*, removed into the Circuit Court of the United States, where all the subsequent proceedings took place. It was tried by a jury, and during its progress an order was made at the request of the plaintiff dismissing the suit as to all of the defendants except Kaufman and Strong. Against each of these a judgment was rendered for separate parcels of the land in controversy; namely, against Kaufman for about two hundred acres of it, constituting the National Cemetery and included within its walls, and against Strong for the remainder of the tract, except seventeen acres in the possession of Maria Syphax.

As the United States was not a party to the suit below, and, while defending the action by its proper law officers, expressly declined to submit itself as a defendant to the jurisdiction of the court, there may exist some doubt whether it has a right to prosecute the writ of error in its own name; but as the judgment against Kaufman and Strong is here on their writ of error, under which all the questions are raised which could be raised under the other, their writ being prosecuted in the interest of the United States, and argued here by the Solicitor-General, the point is immaterial, and the question has not been mooted.

The first step taken in the case after it came into the Circuit Court of the United States was the filing in the clerk's office of that court of the following paper by the Attorney-General: —

"GEORGE W. P. C. LEE

*v.*

FREDERICK KAUFMAN, R. P. STRONG,    } In ejectment.

AND OTHERS.

" And now comes the Attorney-General of the United States and suggests to the court and gives it to understand and be informed (appearing only for the purpose of this motion) that the property in controversy in this suit has been for more than ten years and now is held, occupied, and possessed by the United States, through its officers and agents, charged in behalf of the government of the United States with the control of the property, and who are in the actual possession thereof, as public property of the United States, for public uses, in the exercise of their sovereign and constitutional powers, as a military station, and as a national cemetery established for the burial of deceased soldiers and sailors, and known and designated as the ' Arlington Cemetery,' and for the uses and purposes set forth in the certificate of sale, a copy of which as stated and prepared by the plaintiff, and which is a true copy thereof, is annexed hereto and filed herewith, under claim of title as appears by the said certificate. of sale, and which was executed, delivered, and recorded as therein appears.

" Wherefore, without submitting the rights of the government of the United States to the jurisdiction of the court, but respectfully insisting that the court has no jurisdiction of the subject in controversy, he moves that the declaration in said suit be set aside, and all the proceedings be stayed and dismissed, and for such other order as may be proper in the premises.

"CHAS. DEVENS,

" *Att'y-Gen'l U. S.*"

The plaintiff demurred to this suggestion, and on hearing the demurrer was sustained.

The case was thereupon tried before a jury on the general issue pleaded by Kaufman and Strong, in the course of which the question raised by this suggestion of the Attorney-General was again presented to the court by prayers for instruction, which were rejected, and exceptions taken.

The plaintiff offered evidence establishing title in himself by the will of his grandfather, George Washington Parke Custis, who devised the Arlington estate to his daughter, the wife of General Robert E. Lee, for life, and after her death to the

plaintiff. This, with the long possession under that title, made a *prima facie* right of recovery in the plaintiff.

The title relied on by the defendants is a tax-sale certificate made by the commissioners appointed under the act of Congress of June 7, 1862, c. 98, entitled "An Act for the collection of direct taxes in the insurrectionary districts within the United States," as amended by the act of Feb. 6, 1863, c. 21. At this sale the land was bid in for the United States by the commissioners, who gave a certificate of that fact, which was introduced on the trial as evidence by the defendants.

If this sale was valid and the certificate conveyed a valid title, then the title of the plaintiff was thereby divested, and he could not recover. If the proceedings evidenced by the tax sale did not transfer the title, then it remained in him, and, so far as the question of title was concerned, his recovery was rightful.

We have then two questions presented to the court and jury below, and the same questions arise in this court on the record : —

1. Could any action be maintained against the defendants for the possession of the land in controversy under the circumstances of the relation of that possession to the United States, however clear the legal right to that possession might be in the plaintiff?

2. If such an action could be maintained, was the *prima facie* title of the plaintiff divested by the tax sale and the certificate given by the commissioners?

It is believed that no division of opinion exists among the members of this court on the proposition that the rulings of law under which the latter question was submitted by the court to the jury was sound, and that the jury were authorized to find, as they evidently did find, that the tax certificate and the sale which it recited did not divest the plaintiff of his title to the property.

For this reason we will consider first the assignment of errors on that subject.

No substantial objection is seen on the face of the certificate to its validity, and none has been seriously urged. It was admitted in evidence by the court, and, unless impeached by

extrinsic evidence offered by the plaintiff, it defeated his title.

When this tax sale was made, the act of Feb. 6, 1863, which substitutes a new section seven for that of the original act of June 7, 1862, was in force. It declares that the certificate of the commissioners given to the purchaser at such sale " shall be received in all courts and places as *prima facie* evidence of the regularity and validity of said sale, and of the title of the said purchaser or purchasers under the same ; " and that it " shall only be affected as evidence of the regularity and validity of sale by establishing the fact that said property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed according to the provisions of this act."

It is in reference to the clause which permits the certificate to be impeached by showing that the taxes had been paid previous to sale that the plaintiff in the present case introduced evidence.

This court has in a series of cases established the proposition that where the commissioners refused to receive such taxes, their action in thus preventing payment was the equivalent of payment in its effect upon the certificate of sale. *Bennett* v. *Hunter*, 9 Wall. 326 ; *Tacey* v. *Irwin*, 18 id. 549; *Atwood* v. *Weems*, 99 U. S. 183.

There are exceptions to the ruling of the court on the admission of evidence, and instructions to the jury given and refused on this subject, which are made the foundation of several assignments of error.

All that is necessary to be considered in this matter is presented in the instructions granted and refused. The point in issue is fairly raised by the following, given at the request of the plaintiff and against the objection of the defendants : —

" If the jury believe from the evidence that the commissioners, prior to January 11, 1864, established, announced, and uniformly followed a general rule under which they refused to receive on property which had been advertised for sale from any one but the owner, or a party in interest, in person, when offered, the amount chargeable upon said property by virtue of the said acts of Congress, then said rule dispensed with the

necessity of a tender, and in the absence of proof to the contrary the law presumes that said amount would have been paid, and the court instructs the jury that, upon such a state of facts the sale of the property in controversy made on the eleventh day of January, 1864, was unauthorized, and conferred no title on the purchaser ; " and by instructions 6 and 7, given at the request of the defendants, in the following language : —

" 6th, The burden of proof is upon the plaintiff to establish the fact that the tax commissioners before the sale of this property made a general rule not to receive taxes except from the owner in person after the advertisement and before the sale; and if the jury believe that only two such instances occurred before the sale of this property, and if there is no evidence that the other two commissioners or either of them ever acted under such rule or practice except Commissioner Hawxhurst, or that they or either of them ever concurred in such action before the sale of this property, then the said two instances in which Mr. Hawxhurst alone acted do not establish the said practice by the board of commissioners before the sale of this property in a sufficient manner to render the certificate of sale of this property invalid.

" 7th, In order to establish a general practice or rule of the board of commissioners not to receive taxes except from the owner in person, after advertisement and before sale ; before the date of the sale of the property in controversy, the jury must find from evidence produced on this trial that a majority of such board adopted such practice, or rule, or concurred therein, before the date of the sale of this property, and in the absence of proof to the contrary the law presumes that a majority of such board did not adopt such practice or rule, or concur therein before such date."

We think these presented correctly to the jury the principle established by the cases in this court above referred to. That is, that the commissioners themselves having established and acted upon a rule that payment of the taxes after advertisement would be received from no one but the owner of the land appearing in person to pay them, that if offered by his tenant, his agent, or his attorney in fact duly appointed, it would be rejected, it would be an idle ceremony for any of these to make

the offer, and an actual tender by such persons, as it would certainly not be accepted, need not be made. That the commissioners, having in the execution of the law acted upon a rule which deprived the owner of the land of an important right, a right which went to the root of the matter, a right which has in no instance known to us or cited by counsel been refused to a tax-payer, the sale made under such circumstances is invalid, as much so as if the tax had been actually paid or tendered. The proposition is thus expressed by this court at its last term in *Hills* v. *Exchange Bank*, 105 U. S. 319, as the result of the cases above cited : "It is a general rule that when the tender of performance of an act is necessary to the establishment of any right against another party, this tender or offer to perform is waived or becomes unnecessary when it is reasonably certain that the offer will be refused."

The application of these decisions to the case before us is denied by counsel on two grounds. The first of these is that *Bennett* v. *Hunter* was decided on the language of the act of 1862, and that due attention was not given to the peculiar language of the substituted section seven of the act of 1863, which says that where the owner of the land "shall not, on or before the day of sale, appear in person before the said Board of Commissioners and pay the amount of said tax, with ten per centum interest thereon, with the cost of advertising the same, or request the same to be struck off to a purchaser for a less sum than two-thirds of the assessed value of said several lots or parcels of ground, the said commissioners shall be authorized at said sale to bid off the same for the United States at a sum not exceeding two-thirds of the assessed value thereof." It is argued from this that no right to pay the tax under *this* statute existed except by the owner in person.

The reply to this is that in *Bennett* v. *Hunter* and *Tacey* v. *Irwin* the sales that were under consideration are clearly shown by the reports to have been made after the act of 1863, and it is believed that no sale for taxes was made under the original tax law until after that amendment was passed, and that all the officers charged with the duty of collecting that tax were aware of the language of the new seventh section. It is quite apparent from the opinion of Mr. Chief Justice

Chase, who spoke for the court in *Bennett* v. *Hunter*, and who was Secretary of the Treasury when both statutes were enacted, that he understood well that he was deciding the very question raised by the requirement to appear in person in the latter act, and intended to decide that, notwithstanding this, the owner had a right to pay the tax before sale by an agent or a friend.

Besides, there was no other provision of either the act of 1862 or the amendment of 1863 which gave the owner the right to pay at all between the advertisement and the sale. The third section of the original act gave the right to pay for sixty days after the tax commissioners had fixed the amount of the tax, and no longer ; and the seventh section of that act, as well as its substitute of 1863, gave the right to redeem after the sale was made.

It is clear, therefore, that *Bennett* v. *Hunter*, *Tacey* v. *Irwin*, and *Atwood* v. *Weems* were decisions construing the substituted seventh section of 1863.

In *Turner* v. *Smith*, 14 Wall. 553, this court, in construing the change in the language of the seventh section, held that its object was to authorize the United States, by its commissioners, to bid more than the tax and costs, which they could not do before, and to limit them to two-thirds of the assessed value of the land, and that after the amount of costs and tax had been bid, the United States should not bid against a purchaser named by the owner. It was probably in reference to this that the act required the personal presence of the owner before the commissioners to name a purchaser, against whom the United States should not compete after it was secured by a bid which covered the tax, interest, and costs.

The other point raised is, that the right to pay the taxes between the advertisement and day of sale in any other mode than by personal appearance of the owner before the commissioners, did not exist in cases where the United States became the purchaser. As it could never be known until the day of sale whether the United States would become the purchaser or not, it would seem that the duty of the commissioners to receive the taxes was to be exercised without reference to the possibility of the land being struck off to the United States.

In *Cooley* v. *O'Connor*, 12 Wall. 391, it was held that the act contemplated that a certificate of sale should be given when the United States became the purchaser as in other cases, and no reason is shown why that certificate should have any greater effect as evidence of title than in the case of a private purchaser, nor why it should not be subject to the same rules in determining its validity, nor why the payment or tender of the tax, interest, and costs, should not be made by an agent in the one case as in the other.

It is proper to observe that there was evidence, uncontradicted, to show that Fendall appeared before the commissioners in due time, and on the part of Mrs. Lee, in whom the title then was, offered to pay the taxes, interest, and costs, and was told that the commissioners could receive the money from no one but the owner of the land in person.

In all this matter we do not see any error in the rulings of the court, nor any reason to doubt that the jury were justified in finding that the United States acquired no title under the tax-sale proceedings.

In approaching the other question which we are called on to decide, it is proper to make a clear statement of what it is.

The counsel for plaintiffs in error and in behalf of the United States assert the proposition, that though it has been ascertained by the verdict of the jury, in which no error is found, that the plaintiff has the title to the land in controversy, and that what is set up in behalf of the United States is no title at all, the court can render no judgment in favor of the plaintiff against the defendants in the action, because the latter hold the property as officers and agents of the United States, and it is appropriated to lawful public uses.

This proposition rests on the principle that the United States cannot be lawfully sued without its consent in any case, and that no action can be maintained against any individual without such consent, where the judgment must depend on the right of the United States to property held by such persons as officers or agents for the government.

The first branch of this proposition is conceded to be the established law of this country and of this court at the present day; the second, as a necessary or proper deduction from the first, is denied.

In order to decide whether the inference is justified from what is conceded, it is necessary to ascertain, if we can, on what principle the exemption of the United States from a suit by one of its citizens is founded, and what limitations surround this exemption. In this, as in most other cases of like character, it will be found that the doctrine is derived from the laws and practices of our English ancestors ; and while it is beyond question that from the time of Edward the First until now the King of England was not suable in the courts of that country, except where his consent had been given on petition of right, it is a matter of great uncertainty whether prior to that time he was not suable in his own courts and in his kingly character as other persons were. We have the authority of Chief Baron Comyns, 1 Digest, 132, Action, C. 1, and 6 Digest, 67, Prerogative ; and of the Mirror of Justices, chap. 1, sect. 3, and chap. 5, sect. 1, that such was the law ; and of Bracton and Lord Holt, that the King never was suable of common right. It is certain, however, that after the establishment of the petition of right about that time as the appropriate manner of seeking relief where the ascertainment of the parties' rights required a suit against the King, no attempt has been made to sue the King in any court except as allowed on such petition.

It is believed that this petition of right, as it has been practised and observed in the administration of justice in England, has been as efficient in securing the rights of suitors against the crown in all cases appropriate to judicial proceedings, as that which the law affords to the subjects of the King in legal controversies among themselves. " If the mode of proceeding to enforce it be formal and ceremonious, it is nevertheless a practical and efficient remedy for the invasion by the sovereign power of individual rights." *United States* v. *O'Keefe*, 11 Wall. 178.

There is in this country, however, no such thing as the petition of right, as there is no such thing as a kingly head to the nation, or to any of the States which compose it. There is vested in no officer or body the authority to consent that the State shall be sued except in the law-making power, which may give such consent on the terms it may choose to impose. *The Davis*, 10 Wall. 15. Congress has created a court in which it

has authorized suits to be brought against the United States, but has limited such suits to those arising on contract, with a few unimportant exceptions.

What were the reasons which forbid that the King should be sued in his own court, and how do they apply to the political body corporate which we call the United States of America? As regards the King, one reason given by the old judges was the absurdity of the King's sending a writ to himself to command the King to appear in the King's court. No such reason exists in our government, as process runs in the name of the President, and may be served on the Attorney-General, as was done in *Chisholm* v. *Georgia*, 2 Dall. 419. Nor can it be said that the government is degraded by appearing as a defendant in the courts of its own creation, because it is constantly appearing as a party in such courts, and submitting its rights as against the citizen to their judgment.

Mr. Justice Gray, of the Supreme Court of Massachusetts, in an able and learned opinion which exhausts the sources of information on this subject, says : " The broader reason is, that it would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of the sovereign, to subject him to repeated suits as a matter of right, at the will of any citizen, and to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on his government in war and in peace, and the money in his treasury." *Briggs & Another* v. *Light Boats*, 11 Allen (Mass.), 157. As no person in this government exercises supreme executive power, or performs the public duties of a sovereign, it is difficult to see on what solid foundation of principle the exemption from liability to suit rests. It seems most probable that it has been adopted in our courts as a part of the general doctrine of publicists, that the supreme power in every State, wherever it may reside, shall not be compelled, by process of courts of its own creation, to defend itself from assaults in those courts.

It is obvious that in our system of jurisprudence the principle is as applicable to each of the States as it is to the United States, except in those cases where by the Constitution a State

of the Union may be sued in this court. *Railroad Company* v. *Tennessee*, 101 U. S. 337; *Railroad Company* v. *Alabama*, id. 832.

That the doctrine met with a doubtful reception in the early history of this court may be seen from the opinions of two of its justices in the case of *Chisholm* v. *Georgia*, where Mr. Justice Wilson, a member of the convention which framed the Constitution, after a learned examination of the laws of England and other states and kingdoms, sums up the result by saying: " We see nothing against, but much in favor of, the jurisdiction of this court over the State of Georgia, a party to this cause." Mr. Chief Justice Jay also considered the question as affected by the difference between a republican State like ours and a personal sovereign, and held that there is no reason why a state should not be sued, though doubting whether the United States would be subject to the same rule.

The first recognition of the general doctrine by this court is to be found in the case of *Cohens* v. *Virginia*, 6 Wheat. 264.

The terms in which Mr. Chief Justice Marshall there gives assent to the principle does not add much to its force. " The counsel for the defendant," he says, " has laid down the general proposition that a sovereign independent State is not suable except by its own consent." This general proposition, he adds, will not be controverted.

And while the exemption of the United States and of the several States from being subjected as defendants to ordinary actions in the courts has since that time been repeatedly asserted here, the principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine. *United States* v. *Clarke*, 8 Pet. 436; *United States* v. *McLemore*, 4 How. 286; *Hill* v. *United States*, 9 id. 386; *Nations* v. *Johnson*, 24 id. 195; *The Siren*, 7 Wall. 152; *The Davis*, 10 id. 15.

On the other hand, while acceding to the general proposition that in no court can the United States be sued directly by original process as a defendant, there is abundant evidence in the decisions of this court that the doctrine, if not absolutely limited to cases in which the United States are made defendants by name, is not permitted to interfere with the judicial

enforcement of the established rights of plaintiffs when the
United States is not a defendant or a necessary party to the
suit.

But little weight can be given to the decisions of the English
courts on this branch of the subject, for two reasons : —

1. In all cases where the title to property came into contro-
versy between the crown and a subject, whether held in right
of the person who was king or as representative of the nation,
the petition of right presented a judicial remedy, — a remedy
which this court, on full examination in a case which required
it, held to be practical and efficient. There has been, there-
fore, no necessity for suing the officers or servants of the King
who held possession of such property, when the issue could be
made with the King himself as defendant.

2. Another reason of much greater weight is found in the
vast difference in the essential character of the two govern-
ments as regards the source and the depositaries of power.

Notwithstanding the progress which has been made since the
days of the Stuarts in stripping the crown of its powers and
prerogatives, it remains true to-day that the monarch is looked
upon with too much reverence to be subjected to the demands
of the law as ordinary persons are, and the king-loving nation
would be shocked at the spectacle of their Queen being turned
out of her pleasure-garden by a writ of ejectment against the
gardener. The crown remains the fountain of honor, and the
surroundings which give dignity and majesty to its possessor
are cherished and enforced all the more strictly because of the
loss of real power in the government.

It is not to be expected, therefore, that the courts will per-
mit their process to disturb the possession of the crown by
acting on its officers or agents.

Under our system the *people*, who are there called *subjects*,
are the sovereign. Their rights, whether collective or individ-
ual, are not bound to give way to a sentiment of loyalty to the
person of a monarch. The citizen here knows no person, how-
ever-near to those in power, or however powerful himself, to
whom he need yield the rights which the law secures to him
when it is well administered. When he, in one of the courts
of competent jurisdiction, has established his right to property,

there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right.

Another class of cases in the English courts, in which attempts have been made to subject the public ships and other property of foreign and independent nations found within English territory to their jurisdiction, is also inapplicable to this case; for, both by the English courts and ours, it has been uniformly held that these were questions the decision of which, as it might involve war or peace, must be primarily dealt with by those departments of the government which had the power to adjust them by negotiation, or to enforce the rights of the citizen by war. In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction. Such were the cases of *The Exchange* v. *McFaddon*, 7 Cranch, 116; *Luther* v. *Borden*, 7 How. 1; *State of Georgia* v. *Stanton*, 6 Wall. 50.

The earliest case in this court in which the true rule is laid down, and which, bearing a close analogy to the one before us, seems decisive of it, is *United States* v. *Peters*, 5 Cranch, 115. In an admiralty proceeding commenced before the formation of the Constitution, and which afterwards came into the District Court of the United States for Pennsylvania, that court, after full hearing, had decided that the libellants were entitled to the proceeds of the sale of a vessel condemned as prize of war, which had come to the possession of David Rittenhouse as treasurer of Pennsylvania. The district judge had declined to issue any process to enforce his decree against the representatives of Rittenhouse, on the ground that the funds were held as the property of that State, and that as she could not be subjected to judicial process, neither could the officer who held the money in her right. The analogy to the case before us will be seen when it is further stated that this claim of the State to the money had been fully presented, and that the court had decided that the libellants and not the State were legally entitled to it. In that case, as in this, it was argued that the suit was in reality against the State. But, on an application therefor, a writ

of *mandamus* to compel the judge of the District Court to proceed in the execution of his decree was granted. In delivering the opinion, Mr. Chief Justice Marshall says: "The State cannot be made a defendant to a suit brought by an individual, but it remains the duty of the courts of the United States to decide all cases brought before them by citizens of one State against citizens of a different State, when a State is not necessarily a defendant. In this case, the suit was not instituted against the State or its treasurer, but against the executrixes of David Rittenhouse, for the proceeds of a vessel condemned in the Court of Admiralty, which were admitted to be in their possession. If these proceeds had been the actual property of Pennsylvania, however wrongfully acquired, the disclosure of that fact would have presented a case on which it was unnecessary to give an opinion ; *but it certainly can never be alleged that a mere suggestion of title in a State to property in possession of an individual must arrest the proceedings of the court, and prevent their looking into the suggestion and examining the validity of the title.*"

The case before us is a suit against Strong and Kaufman as individuals, to recover possession of property. The suggestion was made that it was the property of the United States, and that the court, without inquiring into the truth of this suggestion, should proceed no further ; and in this case, as in that, after a judicial inquiry had made it clear that the property belonged to plaintiff and not to the United States, we are still asked to forbid the court below to proceed further, and to reverse and set aside what it has done, and thus refuse to perform the duty of deciding suits properly brought before us by citizens of the United States.

It may be said — in fact it is said — that the present case differs from the one in 5 Cranch, because the officers who are sued assert no personal possession, but are holding as the mere agents of the United States, while the executors of Rittenhouse held the money until a better right was established. But the very next case in this court of a similar character, *Meigs* v. *McClung's Lessee*, 9 Cranch, 11, shows that this distinction was not recognized as sound. The property sued for in that case was land on which the United States had a garrison erected at a cost of

$30,000, and the defendants were the military officers in possession; and the very question now in issue was raised by these officers, who, according to the bill of exceptions, insisted that the action could not be maintained against them, "because the land was occupied by the United States troops, and the defendants as officers of the United States, for the benefit of the United States and by their direction." They further insisted, says the bill of exceptions, that the United States had a right by the Constitution to appropriate the property of the individual citizen. The court below overruled these objections, and held that the title being in plaintiff he might recover, and that "if the land was private property the United States could not have intended to deprive the individual of it without making him compensation therefor."

Although the judgment of the Circuit Court was in favor of the plaintiff, and its result was to turn the soldiers and officers out of possession and deliver it to plaintiff, Mr. Chief Justice Marshall concludes his opinion in this emphatic language: "This court is unanimously and clearly of opinion that the Circuit Court committed no error in instructing the jury that the Indian title was extinguished to the land in controversy, *and that the plaintiff below might sustain his action.*"

We are unable to discover any difference whatever in regard to the objection we are now considering between this case and the one before us.

Impressed by the force of this argument, counsel say that the question of the objection arising out of the possession of the United States was not considered in that case, because it was not urged in argument by counsel. But it is manifest that it was so set out in the bill of exceptions, and so much relied on in the court below that it could not have escaped the attention of the court and of the eminent man who had only six years before delivered the opinion in the case of *United States* v. *Peters.* Nor could the case have been decided as it was if the doctrine now contended for be sound, since the United States was dispossessed of an occupied garrison by the effect of the judgment against the officers in charge of it.

In *Wilcox* v. *Jackson*, 13 Pet. 498, the contest was over a fort of the United States which had been in its continued pos-

session for over thirty years, and was so occupied when the suit was brought against its officers to dispossess them. The case came from the Supreme Court of Illinois to this court on a writ of error, and the judgment in favor of the plaintiff was reversed. The question now under consideration was not passed upon directly by this court. But a long examination of the question whether the plaintiff had proved title in himself, and a decision that while the State courts of Illinois held a certificate of purchase from the United States to be a legal title under her statute, that statute was invalid, might all have been avoided by the simple declaration that the United States, being in possession of the property as a fort, no action at law against its officers could be maintained. But no such proposition was advanced by counsel on either side or considered by the court.

There is a very satisfactory reason for this. *United States v. Peters, Meigs v. McClung,* and *Osborn v. Bank of United States,* had all involved the same question, and in the first and last of these cases the principle was fully discussed, and in the other necessarily decided in the negative. And in *The Governor of Georgia v. Madrazo,* 1 Pet. 110, the court had referred to these cases, and again asserted the principle, quoting the language of them. Counsel were not justified in asking the court to reconsider it while most of the judges were still on the bench, including the Chief Justice, who had made those decisions.

*Osborn v. Bank of United States,* 9 Wheat. 738, is a leading case, remarkable in many respects, and in none more than in those resembling the one before us.

It was this: The State of Ohio having levied a tax upon the branch of the Bank of the United States located in that State, which the bank refused to pay, Osborn, auditor of the State, was about to proceed to collect said tax by a seizure of the money of the bank in its vaults, and an amended bill alleged that he had so seized $100,000, and while aware that an injunction had been issued by the Circuit Court of the United States on the prayer of the bank, the money so seized had been delivered to the treasurer of the State, Curry, and afterwards came to the possession of Sullivan, who had succeeded Curry as treasurer. Both Curry and Sullivan were made defendants as well as Osborn and his assistant, Harper.

One of the objections pressed with pertinacity all through the case to the jurisdiction of the court was the conceded fact that the State of Ohio, though not made a defendant to the bill, was the real party in interest. That all the parties sued were her officers, — her auditor, her treasurer, and their agents, — concerning acts done in their official character, and in obedience to her laws. It was conceded that the State could not be sued, and it was earnestly argued there, as here, that what could not be done directly could not be done by suing her officers. And it was insisted that while the State could not be brought before the court, it was a necessary party to the relief sought, namely, the return of the money and obedience to the injunction, and that the bill must be dismissed.

A few citations from the opinion of Mr. Chief Justice Marshall will show the views entertained by the court on the question thus raised. At page 842 of the long report of the case he says: —

" If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best-established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit."

In another place he says : " The process is substantially, though not in form, against the State, . . . and the direct interest of the State in the suit as brought is admitted ; and had it been in the power of the bank to make it a party, perhaps no decree ought to have been pronounced in the cause until the State was before the court. But this was not in the power of

the bank, . . . and the very difficult question is to be decided, whether, in such a case, the court may act upon agents employed by the State and on the property in their hands." In answering this question he says: "A denial of jurisdiction forbids all inquiry into the nature of the case. It applies to cases perfectly clear in themselves; to cases where the government is in the exercise of its best-established and most essential powers, as well as to those which may be deemed questionable. It asserts that the agents of a State, alleging the authority of a law void in itself because repugnant to the Constitution, may arrest the execution of any law in the United States." Again: "The bank contends that in all cases in which jurisdiction depends on the character of the party, reference is made to the party on the record, not to one who may be interested, but is not shown by the record to be a party." "If this question were to be determined on the authority of English decisions, it is believed that no case can be adduced where any person can be considered as a party who is not made so in the record." Again: "In cases where a State is a party on the record, the question of jurisdiction is decided by inspection. If jurisdiction depend not on this plain fact, but on the interest of the State, what rule has the Constitution given by which this interest is to be measured? If no rule is given, is it to be settled by the court? If so, the curious anomaly is presented of a court examining the whole testimony of a cause, inquiring into and deciding on the extent of a State's interest, without having a right to exercise any jurisdiction in the case. Can this inquiry be made without the exercise of jurisdiction?"

The decree of the Circuit Court ordering a restitution of the money was affirmed.

*Grisar* v. *McDowell*, 6 Wall. 363, was an action in the Circuit Court against General McDowell to recover possession of property held by him as an officer of the United States which had been set apart and reserved for military purposes. Though this was set up by him as part of his defence, it does not appear that in the argument of counsel for the government, or in the opinion of the court, any importance was attached to this circumstance; but the opinion of Mr. Justice Field in this court examines the case elaborately on the question whether

plaintiff or the government had the title to the land.  If the doctrine now contended for is sound, the case should have proceeded no further on the suggestion, not denied, that the property was held for public use by a military officer under orders from the President.

*Brown* v. *Huger*, 21 How. 305, is of a precisely similar character, for the possession of the military arsenal at Harper's Ferry, in which, while the fact of its possession by the United States was set out in the bill of exceptions, no attention is given to that fact in the opinion of this court, which consists of an elaborate examination of plaintiff's title, held to be insufficient.

These decisions have never been overruled.  On the contrary, as late as the case of *Davis* v. *Gray*, 16 Wall. 203, the case of *Osborn* v. *Bank of United States* is cited with approval as establishing these among other propositions: "Where the State is concerned, the State should be made a party, if it can be done.  That it cannot be done, is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record.  In deciding who are parties to the suit, the court will not look beyond the record.  Making a State officer a party does not make the State a party, *although her law may have prompted his action, and the State may stand behind him as a real party in interest.*  A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case."

Though not prepared to say now that the court can proceed against the officer in "all respects" as if the State were a party, this may be taken as intimating in a general way the views of the court at that time.

*The Siren*, 7 Wall 152, and *The Davis*, 10 id. 15, are instances where the court has held that property of the United States may be dealt with by subjecting it to maritime liens, where this can be done without making the United States a party.

This examination of the cases in this court establishes clearly this result: that the proposition that when an individual is

sued in regard to property which he holds as officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it, and that in many others where the record shows that the case as tried below actually and clearly presented that defence, it was neither urged by counsel nor considered by the court here, though, if it had been a good defence, it would have avoided the necessity of a long inquiry into plaintiff's title and of other perplexing questions, and have quickly disposed of the case. And we see no escape from the conclusion that during all this period the court has held the principle to be unsound, and in the class of cases like the present, represented by *Wilcox* v. *Jackson, Brown* v. *Huger*, and *Grisar* v. *McDowell*, it was not thought necessary to re-examine a proposition so often and so clearly overruled in previous well-considered decisions.

It is true that there are expressions in the opinion of the court in the case of *Carr* v. *United States*, 98 U. S. 433, which are relied on by counsel with much confidence as asserting a different doctrine.

That was a case in which the United States had filed a bill in the Circuit Court for the District of California to quiet title to the land on which a marine hospital had been built. To rebut the evidence of title offered by the plaintiffs, the defendant had relied on certain judgments rendered in the State courts, in which the unsuccessful parties set up title in the United States, under which they claimed. It appeared that the person who was district attorney of the United States had defended these actions, and the question under discussion was whether the United States was estopped by the proceedings so as to be unable to sustain the suit to quiet title. After stating the general doctrine that the United States cannot be sued without her consent, and the further proposition that no such consent can be given except by Congress, which is a sufficient reason why they cannot be concluded by an action to which they are not parties, the learned justice who delivered the opinion proceeded to make some remarks as to cases in which actions would or would not lie against officers of the govern-

ment in relation to property of the United States in their possession. As these remarks were not necessary to the decision of the point then in question, as the action was equally inconclusive against the United States, whether the persons sued were officers of the government or not, these remarks, if they have the meaning which counsel attribute to them, must rest for their weight as authority on the high character of the judge who delivered them, and not on that of the court which decided the case.

That the United States are not bound by a judgment to which they are not parties, and that no officer of the government can, by defending a suit against private persons, conclude the United States by the judgment, was sufficient to decide that case, and was all that was decided.

The fact that the property which is the subject of this controversy is devoted to public uses, is strongly urged as a reason why those who are so using it under the authority of the United States shall not be sued for its possession even by one who proves a clear title to that possession. In this connection many cases of imaginary evils have been suggested, if the contrary doctrine should prevail. Among these are a supposed seizure of vessels of war, and invasions of forts and arsenals of the United States. Hypothetical cases of great evils may be suggested by a particularly fruitful imagination in regard to almost every law upon which depend the rights of the individual or of the government, and if the existence of laws is to depend upon their capacity to withstand such criticism, the whole fabric of the law must fail.

The cases already cited of *Meigs* v. *McClung, Wilcox* v. *Jackson, Georgia* v. *Madrazo, Grisar* v. *McDowell, Brown* v. *Huger,* and *Osborn* v. *Bank of United States,* necessarily involved this question, for the property recovered by the plaintiff in the case of *Meigs* v. *McClung* was a garrison and barracks then in use for such purposes by the officers of the United States who were sued. In *Wilcox* v. *Jackson,* an action was brought to recover, among other things, a fort which had been in the occupation of the United States for thirty years, and which was then occupied by an officer of the army of the United States and his command. In *Osborn* v. *Bank of United States,* the

money sued for and recovered by the final decree of this court was claimed by the State of Ohio as part of her public funds, and devoted by her laws to public uses in all the exigencies of the public service; so that the authorities we have examined, if they are worth anything, meet this objection as they meet the others which we have considered.

The objection is also inconsistent with the principle involved in the last two clauses of article 5 of the amendments to the Constitution of the United States, whose language is: "That no person . . . shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation."

Conceding that the property in controversy in this case is devoted to a proper public use, and that this has been done by those having authority to establish a cemetery and a fort, the verdict of the jury finds that it is and was the private property of the plaintiff, and was taken without any process of law and without any compensation. Undoubtedly those provisions of the Constitution are of that character which it is intended the courts shall enforce, when cases involving their operation and effect are brought before them. The instances in which the life and liberty of the citizen have been protected by the judicial writ of *habeas corpus* are too familiar to need citation, and many of these cases, indeed almost all of them, are those in which life or liberty was invaded by persons assuming to act under the authority of the government. *Ex parte Milligan*, 4 Wall. 2.

If this constitutional provision is a sufficient authority for the court to interfere to rescue a prisoner from the hands of those holding him under the asserted authority of the government, what reason is there that the same courts shall not give remedy to the citizen whose property has been seized without due process of law, and devoted to public use without just compensation?

Looking at the question upon principle, and apart from the authority of adjudged cases, we think it still clearer that this branch of the defence cannot be maintained. It seems to be opposed to all the principles upon which the rights of the citizen, when brought in collision with the acts of the government,

must be determined.  In such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name.  There remains to him but the alternative of resistance, which may amount to crime. The position assumed here is that, however clear his rights, no remedy can be afforded to him when it is seen that his opponent is an officer of the United States, claiming to act under its authority ; for, as Mr. Chief Justice Marshall says, to examine whether this authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question.  The objection of the plaintiffs in error necessarily forbids any inquiry into the truth of the assumption that the parties setting up such authority are lawfully possessed of it ; for the argument is that the formal suggestion of the existence of such authority forbids any inquiry into the truth of the suggestion.

But why should not the truth of the suggestion and the lawfulness of the authority be made the subject of judicial investigation ?

In the case supposed, the court has before it a plaintiff capable of suing, a defendant who has no personal exemption from suit, and a cause of action cognizable in the court, — a *case* within the meaning of that term, as employed in the Constitution and defined by the decisions of this court.  It is to be presumed in favor of the jurisdiction of the court that the plaintiff may be able to prove the right which he asserts in his declaration.

What is that right as established by the verdict of the jury in this case ?  It is the right to the possession of the homestead of plaintiff.  A right to recover that which has been taken from him by force and violence, and detained by the strong hand.  This right being clearly established, we are told that the court can proceed no further, because it appears that certain military officers, acting under the orders of the President, have seized this estate, and converted one part of it into a military fort and another into a cemetery.

It is not pretended, as the case now stands, that the President had any lawful authority to do this, or that the legislative

body could give him any such authority except upon payment of just compensation. The defence stands here solely upon the absolute immunity from judicial inquiry of every one who *asserts* authority from the executive branch of the government, however clear it may be made that the executive possessed no such power. Not only no such power is given, but it is absolutely prohibited, both to the executive and the legislative, to deprive any one of life, liberty, or property without due process of law, or to take private property without just compensation.

These provisions for the security of the rights of the citizen stand in the Constitution in the same connection and upon the same ground, as they regard his liberty and his property. It cannot be denied that both were intended to be enforced by the judiciary as one of the departments of the government established by that Constitution. As we have already said, the writ of *habeas corpus* has been often used to defend the liberty of the citizen, and even his life, against the assertion of unlawful authority on the part of the executive and the legislative branches of the government. See *Ex parte Milligan*, 4 Wall. 2 ; *Kilbourn .v. Thompson*, 103 U. S. 168.

No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class.

Shall it be said, in the face of all this, and of the acknowledged right of the judiciary to decide in proper cases, statutes which have been passed by both branches of Congress and approved by the President to be unconstitutional, that the

courts cannot give a remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without lawful authority, without process of law, and without compensation, because the President has ordered it and his officers are in possession?

If such be the law of this country, it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights.

It cannot be, then, that when, in a suit between two citizens for the ownership of real estate, one of them has established his right to the possession of the property according to all the forms of judicial procedure, and by the verdict of a jury and the judgment of the court, the wrongful possessor can say successfully to the court, Stop here, I hold by order of the President, and the progress of justice must be stayed. That, though the nature of the controversy is one peculiarly appropriate to the judicial function, though the United States is no party to the suit, though one of the three great branches of the government to which by the Constitution this duty has been assigned has declared its judgment after a fair trial, the unsuccessful party can interpose an absolute veto upon that judgment by the production of an order of the Secretary of War, which that officer had no more authority to make than the humblest private citizen.

The evils supposed to grow out of the possible interference of judicial action with the exercise of powers of the government essential to some of its most important operations, will be seen to be small indeed compared to this evil, and much diminished, if they do not wholly disappear, upon a recurrence to a few considerations.

One of these, of no little significance, is, that during the existence of the government for now nearly a century under the present Constitution, with this principle and the practice under it well established, no injury from it has come to that government. During this time at least two wars, so serious as to call into exercise all the powers and all the resources of the government, have been conducted to a successful issue. One of these was a great civil war, such as the world has seldom

known, which strained the powers of the national government to their utmost tension. In the course of this war persons hostile to the Union did not hesitate to invoke the powers of the courts for their protection as citizens, in order to cripple the exercise of the authority necessary to put down the rebellion ; yet no improper interference with the exercise of that authority was permitted or attempted by the courts. *State of Mississippi* v. *Johnson*, 4 Wall. 475 ; *State of Georgia* v. *Stanton*, 6 id. 50 ; *State of Georgia* v. *Grant*, id. 241 ; *Ex parte Tarble*, 13 id. 397.

Another consideration is, that since the United States cannot be made a defendant to a suit concerning its property, and no judgment in any suit against an individual who has possession or control of such property can bind or conclude the government, as is decided by this court in the case of *Carr* v. *United States*, already referred to, the government is always at liberty, notwithstanding any such judgment, to avail itself of all the remedies which the law allows to every person, natural or artificial, for the vindication and assertion of its rights. Hence, taking the present case as an illustration, the United States may proceed by a bill in chancery to quiet its title, in aid of which, if a proper case is made, a writ of injunction may be obtained. Or it may bring an action of ejectment, in which, on a direct issue between the United States as plaintiff, and the present plaintiff as defendant, the title of the United States could be judicially determined. Or, if satisfied that its title has been shown to be invalid, and it still desires to use the property, or any part of it, for the purposes to which it is now devoted, it may purchase such property by fair negotiation, or condemn it by a judicial proceeding, in which a just compensation shall be ascertained and paid according to the Constitution.

If it be said that the proposition here established may subject the property, the officers of the United States, and the performance of their indispensable functions to hostile proceedings in the State courts, the answer is, that no case can arise in a State court, where the interests, the property, the rights, or the authority of the Federal government may come in question, which cannot be removed into a court of the United States

under existing laws.  In all cases, therefore, where such questions can arise, they are to be decided, at the option of the parties representing the United States, in courts which are the creation of the Federal government.

The slightest consideration of the nature, the character, the organization, and the powers of these courts will dispel any fear of serious injury to the government at their hands.

While by the Constitution the judicial department is recognized as one of the three great branches among which all the powers and functions of the government are distributed, it is inherently the weakest of them all.

Dependent as its courts are for the enforcement of their judgments upon officers appointed by the executive and removable at his pleasure, with no patronage and no control of the purse or the sword, their power and influence rest solely upon the public sense of the necessity for the existence of a tribunal to which all may appeal for the assertion and protection of rights guaranteed by the Constitution and by the laws of the land, and on the confidence reposed in the soundness of their decisions and the purity of their motives.

From such a tribunal no well-founded fear can be entertained of injustice to the government, or of a purpose to obstruct or diminish its just authority.

The Circuit Court was competent to decide the issues in this case between the parties that were before it; in the principles on which these issues were decided no error has been found; and its judgment is

*Affirmed.*

MR. JUSTICE GRAY, with whom concurred MR. CHIEF JUSTICE WAITE, MR. JUSTICE BRADLEY, and MR. JUSTICE WOODS, dissenting.

MR. JUSTICE GRAY.  The Chief Justice, Mr. Justice Bradley, Mr. Justice Woods, and myself are unable to concur in the judgment of the majority of the court.  The case so deeply affects the sovereignty of the United States, and its relations to the citizen, that it is fit to announce the grounds of our dissent.

The action is ejectment, originally brought by George W. P. C. Lee against Frederick Kaufman and Richard P. Strong in a court of the State of Virginia, to recover possession of a tract of land known as Arlington, of which the plaintiff alleged that he was seized in fee.

The whole tract, having been advertised for sale for non-payment of direct taxes lawfully assessed upon it, and having been selected for government use for war, military, charitable, and educational purposes by the President of the United States under the power conferred on him by the act of Congress of Feb. 6, 1863, c. 21, was accordingly, in 1864, bid off to the United States at the tax sale; and for many years has been, and now is, held and occupied by the United States, through Kaufman and Strong in charge thereof, under the certificate of sale of the tax commissioners, and for the purposes aforesaid, and also under orders of the Secretary of War, part of it for a military station, and the rest as a national cemetery for the burial of deceased soldiers and sailors. These facts were made to appear at three stages of the case.

*First*, They were stated in a petition filed by Kaufman and Strong in the State court, for the removal of the case into the Circuit Court of the United States under sect. 643 of the Revised Statutes, on the ground that the defendants were officers of the United States, and holding the land by title derived from officers of the United States, acting under a revenue law of the United States, the validity of which was affected. That petition was granted and the case removed accordingly.

*Second*, They were stated in a suggestion and motion, filed by the Attorney-General in the Circuit Court of the United States before trial, protesting against the jurisdiction of the court and moving for a stay of proceedings; which was demurred to by the plaintiff, and overruled by the court.

*Third*, They were proved by the evidence produced by each party at the trial, and were assumed in the instructions given as well as in those requested. One of the instructions requested by the defendants was as follows: "If the jury believe from the evidence that the United States is in the possession of the property in controversy, through its officers and agents charged with the control of the same; that the defendants

occupy the same only as such officers and agents, in obedience to orders of the War Department of the United States, and making no claim of right to the title or possession thereof, except as such officers; that the United States is using the same as a national cemetery for the burial of deceased soldiers, and as a fort and reserve connected therewith, claiming the title thereto under the certificate of sale proved in this cause; then the verdict must be for the defendants." The court refused this instruction, and gave the following: "If the jury believe from the evidence that at the institution of this suit the premises in controversy were, or that any part thereof was, under the charge and in the occupation or possession of the defendants Strong and Kaufman, or either of them, under the direction of the government of the United States, or of any department or officer thereof, then such occupation or possession is sufficient to enable the plaintiff to maintain his action against them respectively for the premises so occupied or possessed by them respectively."

The court submitted the case to the jury under further instructions, which permitted them to find for the plaintiff upon the ground that the certificate of sale for taxes was invalid as against him, and had vested no legal title in the United States. The jury returned a verdict, upon which judgment was rendered, that the plaintiff recover possession of the premises, partly against Kaufman and partly against Strong. Writs of error were sued out by the United States, and by Kaufman and Strong, and the case has been argued upon both these writs of error.

This is not an action of trespass to recover damages only. Nor is it an action to recover property violently and suddenly wrested from the owner by officers of the government without its directions and without color of title in the government. But it is brought to recover possession of land which the United States have for years held, and still hold, for military and other public purposes, claiming title under a certificate of sale for direct taxes, which is declared by the act of Congress of June 7, 1862, c. 98, sect. 7, to be *prima facie* evidence of the regularity and validity of the sale and of the title of the purchaser, and which has been defined by this court as a "public act which is

the equivalent of office found." *Bennett* v. *Hunter*, 9 Wall. 326, 336.

The principles upon which we are of opinion that the court below had no authority to try the question of the validity of the title of the United States in this action, and that this court has therefore no authority to pass upon that question, may be briefly stated.

The sovereign is not liable to be sued in any judicial tribunal without its consent. The sovereign cannot hold property except by agents. To maintain an action for the recovery of possession of property held by the sovereign through its agents, not claiming any title or right in themselves, but only as the representatives of the sovereign and in its behalf, is to maintain an action to recover possession of the property against the sovereign; and to invade such possession of the agents, by execution or other judicial process, is to invade the possession of the sovereign, and to disregard the fundamental maxim that the sovereign cannot be sued.

That maxim is not limited to a monarchy, but is of equal force in a republic. In the one, as in the other, it is essential to the common defence and general welfare that the sovereign should not, without its consent, be dispossessed by judicial process of forts, arsenals, military posts, and ships of war, necessary to guard the national existence against insurrection and invasion; of custom-houses and revenue cutters, employed in the collection of the revenue; or of light-houses and light-ships, established for the security of commerce with foreign nations and among the different parts of the country.

These principles appear to us to be axioms of public law, which would need no reference to authorities in their support, were it not for the exceeding importance and interest of the case, the great ability with which it has been argued, and the difference of opinion that has been manifested as to the extent and application of the precedents.

The exemption of the United States from being impleaded without their consent is, as has often been affirmed by this court, as absolute as that of the Crown of England or any other sovereign. In *Cohens* v. *Virginia*, 6 Wheat. 264, 411, Mr. Chief Justice Marshall said: " The universally received opinion is, that

no suit can be commenced or prosecuted against the United States." In *Beers* v. *Arkansas*, 20 How. 527, 529, Mr. Chief Justice Taney said : " It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission ; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another State ; and as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it." In the same spirit, Mr. Justice Davis, delivering the judgment of the court in *Nichols* v. *United States*, 7 Wall. 122, 126, said : " Every government has an inherent right to protect itself against suits, and if, in the liberality of legislation, they are permitted, it is only on such terms and conditions as are prescribed by statute. The principle is fundamental, applies to every sovereign power, and, but for the protection which it affords, the government would be unable to perform the various duties for which it was created." See also *United States* v. *Clarke*, 8 Pet. 436, 444 ; *Cary* v. *Curtis*, 3 How. 236, 245, 256 ; *United States* v. *McLemore*, 4 id. 286, 289 ; *Hill* v. *United States*, 9 id. 386, 389 ; *Reeside* v. *Walker*, 11 id. 272, 290 ; *De Groot* v. *United States*, 5 Wall. 419, 431 ; *United States* v. *Eckford*, 6 id. 484, 488 ; *The Siren*, 7 id. 152, 154 ; *The Davis*, 10 id. 15, 20 ; *United States* v. *O'Keefe*, 11 id. 178 ; *Case* v. *Terrell*, id. 199, 201 ; *Carr* v. *United States*, 98 U. S. 433, 437 ; *United States* v. *Thompson*, id. 486, 489 ; *Railroad Company* v. *Tennessee*, 101 id. 337 ; *Railroad Company* v. *Alabama*, id. 832.

The English authorities from the earliest to the latest times show that no action can be maintained to recover the title or possession of land held by the crown by its officers or servants, and leave no doubt that in a case like the one before us the proceedings would be stayed at the suggestion of the Attorney-General in behalf of the crown.

Our citations will be confined to the time since Magna Charta declared that no man should be taken or imprisoned,

or be disseized of his freehold or liberties or free customs, or be outlawed or exiled or in any way destroyed, or be passed upon or condemned, but by the lawful judgment of his peers, or by the law of the land, — which is the origin of the provision, embodied in the Fifth Amendment of the Constitution of the United States, that no man shall be deprived of life, liberty, or property without due process of law.

The earliest authority to be referred to is Bracton, who wrote in the reign of Henry III., and who, in the famous passage of his first book, affirms that the King ought not to be subject to man, but to God and to the law, because the law makes the King; and therefore the King should ascribe to the law what the law ascribes to him, namely, dominion and power, for there is no King where reigns will and not law. *Ipse autem rex non debet esse sub homine, sed sub Deo et sub lege, quia lex facit regem. Attribuat igitur rex legi, quod lex attribuit ei, videlicet, dominium et potestatem, non est enim rex, ubi dominatur voluntas et non lex.* Bract. 5 *b.*

Yet no one states more strongly than Bracton the exemption of the King from being sued without his consent in such a case as this; for he says that one who has been disseized by the King, or by his bailiffs in his name, *per dominum regem vel ballivos suos nomine suo*, or, as he elsewhere says, whom the King, or any one in his behalf or in his name, *aliquis pro eo vel nomine suo*, has ejected, cannot, even if the disseisin be manifest, prosecute an assise to recover possession of the land without the King's consent, but must await his pleasure whether the assise shall proceed or not, *expectanda erit voluntas domini regis quod procedat assisa vel non procedat.* Bract. 168 *b*, 171 *b*, 212 *a.*

Lord Coke tells us that before the Statute of Westminster I. (3 Edw. I.), c. 24, if an officer of the King, by mere color of his office, and not by the King's command, disseized a man of his freehold, the only remedy was by petition to the King; and that it was to relieve against this evil that the statute enacted that no escheator, sheriff, or other bailiff of the King, " by color of his office, without special warrant or commandment, or authority certain pertaining to his office," should disseize any man of his freehold, and that, if he should do so,

the disseizee might at his election proceed either by petition to the King, or by assise of novel disseisin at the common law, and the officer should pay double damages to the plaintiff, and a heavy fine to the King, for doing injury in his name to the subject.   2 Inst. 206, 207.   But when the entry of the officer was by the King's command, though without authority of law, that statute had no application.

Accordingly in Staunford's Exposition of the King's Prerogative, c. 22, it is laid down : " Petition is all the remedy the subject hath when the King seizeth his land, or taketh away his goods from him, having no title by order of his laws so to do, in which case the subject for his remedy is driven to sue unto his sovereign lord by way of petition ; for other remedy hath he not." Staunf. Prerog., fol. 72 *b.* " Also whereas the King doth enter upon me, having no title by matter of record or otherwise, and put me out, and detains the possession from me, that I cannot have it again by entry without suit, I have then no remedy but only by petition. But if I be suffered to enter, my entry is lawful, and no intrusion. Or if the King grant over the lands to a stranger, then is my petition determined, and I may now enter or have my assise by order of the common law against the said stranger, being the King's patentee." " When his Highness seizeth by his absolute power contrary to the order of his laws, although I have no remedy against him for it but by petition, for the dignity's sake of his person, yet when the cause is removed and a common person hath the possession, then is my assise revived, for now the patentee entereth by his own wrong and intrusion, and not by any title that the King giveth him, for the King had never title nor possession to give in that case." Fol. 74 *b.*

In the reign of Elizabeth, it was resolved by all the judges of England, that " when the King was seized of any estate of inheritance or freehold by any matter of record, be his title by matter of record judicial or ministerial, or by conveyance of record, or by matter in fact and found by office of record, he who has right could not by the common law have any traverse upon which he was to have *amoveas manum,* but was put to his petition of right (in nature of his real action which he could

not have against the King, because the King by his writ can-
not command himself) to be restored to his freehold and in-
heritance;" unless, indeed, the right of the party aggrieved
appeared by the same record, in which case he might by *mon-
strans de droit* obtain an *amoveas manum*. *Sadlers's Case*, 4 Rep.
54 *b*, 55 *a*.

Lord Hale enumerates, among the relative prerogatives of
the crown, the prerogative " of his possessions, — that no man
can enter upon him, but is driven to his suit by petition."
Hale's Analysis of the Law, sect. 9.

The law laid down in the early authorities is stated in the
same way in the Digest of Chief Baron Comyns, written in
the first half of the last century, and in Chitty on the Pre-
rogative of the Crown, published in 1820; and Mr. Chitty
treats the action of ejectment as equivalent in this aspect to
the ancient form of proceeding by assise. Com. Dig. Preroga-
tive, D. 78 ; Chit. Prerog. 339–343, and note *c*.

In *The Queen* v. *Powell*, 1 Q. B. 352; s. c. 4 Per. & Dav.
719, a writ of *mandamus* to admit to a copyhold tenement of
a manor belonging to the crown having been directed to the
steward alone, it was contended for the prosecutor that a pre-
vious decision, requiring the writ to be directed to the lord of
the manor as well as to the steward, applied only to cases
where the lord of the manor was a subject, and that, inasmuch
as there could be no *mandamus* to the sovereign, the writ must
go against the steward alone. But Lord Denman, with the
concurrence of Justices Littledale, Williams, and Coleridge,
quashed the writ of *mandamus;* and, after observing that
doubtless there could be no *mandamus* to the sovereign, but
that the interests of the crown were to be as much guarded as
those of the subject, said : " And if the interests of the crown
cannot so effectually be protected by a writ against the steward
alone, it is a very strong reason to show that such a writ can-
not be sustained. Indeed, if it were allowed, it is not certain
of being effectual; for if the advisers of the crown were of
opinion that its interests might be affected, and were to advise
the sovereign either to order the steward not to admit the
prosecutor of the *mandamus*, or to revoke the appointment of
the steward, this court could not grant an attachment against

the steward, and then the party does not get admitted. And, indeed, if we were to allow a *mandamus* to the steward alone, and the writ were obeyed, the property of the crown would be affected indirectly by the *mandamus* to the steward alone, when it cannot be affected directly by making the sovereign a party to the *mandamus*." "But in the case where there is a complaint on the part of a subject against the crown in any matter whatever, the course is to proceed by petition of right, or else by *monstrans de droit*, or traverse of office, as the case may require. These proceedings have been recognized and acknowledged for many centuries. Such proceedings are now very much out of use; and few instances in modern times have occurred where they have been resorted to; but still they are what must be resorted to if any dispute arises. They are probably expensive and tedious; but these considerations are not sufficient for our dispensing with them; we have no more authority, for the sake of convenience, to lay them aside and introduce writs or other proceedings which are usually adopted between subject and subject, amongst which these writs of *mandamus* are to be reckoned, than to introduce writs and other proceedings, now solely used in cases of prerogative, in causes between subject and subject."

In *The Queen* v. *Commissioners of the Treasury*, Law Rep. 7 Q. B. 387, 394, in which the court refused to grant a writ of *mandamus* to the Lords Commissioners of the Treasury to pay over money in their hands as servants of the crown, Lord Chief Justice Cockburn said that it did not follow, because the prosecutor had no remedy except that of applying by petition to the crown, or by petition to Parliament, that the court could issue a writ of *mandamus*; and added: "I take it, with reference to that jurisdiction, we must start with this unquestionable principle, that when a duty has to be performed (if I may use that expression) by the crown, this court cannot claim, even in appearance, to have any power to command the crown; the thing is out of the question. Over the sovereign we can have no power. In like manner where the parties are acting as servants of the crown, and are amenable to the crown, whose servants they are, they are not amenable to us in the exercise of our prerogative jurisdiction."

In *Doe* v. *Roe*, 8 Mee. & W. 579 ; s. c. Hurlst. & W. 159, which was an action of ejectment for a house and lands adjoining Hurst Castle, the declaration had been served upon one Watson and upon the· Board of Ordnance. On motion of the Attorney-General in behalf of the crown, supported by affidavits that the castle was an hereditary possession of the crown of England, and that the premises sought to be recovered were in possession of the crown, by Watson, who had been placed, by authority of the Board of Ordnance, as master gunner in charge of the defences of the castle, which commanded the passage of the Needles, the Court of Exchequer ordered the declaration to be set aside and all further proceedings stayed. It was contended for the plaintiff that technically the action was trespass against Roe ; and that the argument on the other side would go the length of showing that in any case where the defendant in ejectment made an affidavit that the title of the crown came into question the plaintiff would have no resource but in his petition of right. Whereupon the court made these observations : " Lord Abinger, C. B. The real question is, Can an ejectment be tried, the effect of which may be to turn the crown out of possession ? Alderson, B. The declaration is served on a person occupying as the servant of the crown ; this case is not like the case put of lands held under the Woods and Forests ; the present difficulty only arises when, supposing the plaintiff to succeed, the crown would be turned out of possession." Hurlst. & W. 160. At the close of the argument, Lord Abinger said : " It is quite clear the court could not issue any process to turn the crown out of possession ; and the only doubt I had was, whether this property was not, by the operation of the act of Parliament, in the possession, not of the crown, but of the Board of Ordnance. But on looking more fully into the act, my doubt is entirely removed." Baron Alderson said : " I am of the same opinion. No ejectment can be maintained against the crown, to turn the crown out of possession by the authority of the crown itself." And Baron Rolfe (afterwards Lord Chancellor Cranworth) added : " The question may be tested thus : suppose there were no trial, but judgment went against the casual ejector ; then there would

only be a writ to turn the crown out of possession, which clearly cannot be." 8 Mee. & W. 582, 583.

The same rule, as well as the essential distinction in actions brought against a servant of the crown holding possession in behalf of the crown, between an action of trespass to recover damages, which might be suffered to proceed (although the crown might have it removed for that purpose into the Court of Exchequer), and an action of ejectment to recover possession of the land itself, which must be absolutely stayed on motion of the Attorney-General, is clearly recognized in two cases of trespass to recover damages against officers of the crown, removed upon application of the Attorney-General into the Office of Pleas of the Exchequer for trial. *Cawthorne* v. *Campbell*, 1 Anstr. 205, 215; *Attorney-General* v. *Hallett*, 15 Mee. & W. 97.

In *Cawthorne* v. *Campbell*, Chief Baron Eyre, speaking of a case, decided in 1710, of an ejectment brought in the Court of Queen's Bench for lands which were part of the Queen's estate, said: " There was an application to this court to stay the proceedings, and the parties were heard upon it. The Attorney-General attended, and after the hearing it was put off for a day or two. At length the entry is, that an injunction issued *pro domina regina*. So that the action was not removed, but simply an injunction went to stay the proceedings. And I think I can see why that was: if the action had been removed, the question could not have been tried, even in the Office of Pleas, because you cannot try the Queen's title in an ejectment. - The Queen was in possession; her hands must be removed by some other course of proceeding than an ejectment; and therefore it was fruitless to think of removing it, and it remained under an injunction."

So in *Attorney-General* v. *Hallett*, a case of trespass *quare clausum fregit*, in which the defendant pleaded that the Queen was seized in right of her crown of the *locus in quo*, Chief Baron Pollock said: " The action of ejectment is *prima facie* an action merely between subject and subject, and relates to land; yet the prerogative of the crown applies to that; and if the interest of the crown is concerned, an action of ejectment may be removed into this court. It may be said, how-

ever, that that does not amount to an authority, because the action does not go on'; the reason of that is, that in this court an action of ejectment will not lie against the crown. The party must proceed by a petition of right. In an action of ejectment, we remove it, although we thereby actually extinguish the action; and therefore that is rather an *a fortiori* argument for removing this cause, which is sought to be removed for the express purpose of going on with it." Barons Parke, Alderson, and Platt concurred; and Baron Platt clearly distinguished the case of a defendant holding possession in behalf of the crown from that of a defendant claiming a right in himself only, though under a grant from the crown, saying: " If the Queen herself is in possession, no subject can maintain ejectment against her; the only mode of proceeding is by petition of right. If the subject is in possession, claiming a right under the crown, then the ejectment may be maintained; but, at the suggestion of the Attorney-General, the proceeding would be brought into this court."

There is a close analogy between these cases and the case at bar. Any action, personal or real, against officers of the sovereign, who justify under a revenue law, may be removed in England into the Court of Exchequer, and under the acts of Congress into the Circuit Court of the United States. If it is an action of tort to recover damages only, it may there proceed to trial. But if it is an action to recover possession of land, which is in fact held by the sovereign through its officers and agents, and that fact is in due form made known to the court, the proceedings must be stayed.

An action of ejectment brought, as this was, under the Code of Virginia of 1873, c. 131, affects the title to land more than the action of ejectment in England. By that code, the action may not only be brought as before, but it is also made a substitute for the writ of right and all other real actions. Sects. 1, 2, 38. It must be brought by and in the name of a person having a subsisting interest in the premises, and a right to recover the premises or the possession thereof; and against the person actually occupying the premises, or, if they are not occupied, against some person exercising acts of ownership therein, or claiming title thereto or some interest therein.

Sects. 4–6. The only plea allowed is the general issue, that the defendant is not guilty of unlawfully withholding the premises claimed. Sect. 13. The declaration must describe the premises with such certainty that from the description possession can be delivered; and it must state, and the verdict must find, whether the plaintiff's estate is in fee, or for life and whose life, or for years and the duration of the term. Sects. 8, 9, 27. Judgment for the plaintiff is that he recover the possession of the premises according to the verdict, if there is one, or, if on default or demurrer, according to the description in the declaration. Sect. 29. Several judgments may be recovered against several defendants occupying distinct parcels of the land. Sect. 17. And the judgment is conclusive as to the title or right of possession, established in the action, upon the party against whom it is rendered, and all persons claiming under him by title accruing after the commencement of the action. Sect. 35.

The principle that no sovereign can be sued without its consent applies equally to foreign sovereigns and to the sovereign of the country in which the suit is brought. The exemption of the sovereign is not less regarded by its own courts than by the courts of other sovereigns. To repeat the words of Chief Justice Taney, already quoted: "It is an established principle of jurisprudence in all civilized nations, that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission.".

In the leading case of *The Exchange*, 7 Cranch, 116, the exemption of a foreign sovereign from being sued in our courts was held to protect one of his public armed vessels from being libelled here in a court of admiralty by citizens of the United States, to whom she had belonged, and from whom she had been forcibly taken in a foreign port by his order. The district attorney of the United States having filed a suggestion, verified by affidavit, that she was a public armed vessel of the Emperor of the French, and actually employed in his service at the time of entering our ports, the Circuit Court, disregarding the suggestion, entered a decree for the libellants. But upon an appeal taken by the attorney of the United States, this court, without any inquiry into the title, reversed the decree

and dismissed the libel; and Mr. Chief Justice Marshall in deli<sup>,,</sup>ring judgment said: "There seems to be a necessity for admitting that the fact might be disclosed to the court by the suggestion of the attorney for the United States."

In *Vavasseur* v. *Krupp*, 9 Ch. D. 351, the Mikado of Japan, a sovereign prince, bought in Germany shells, made there, but said to be infringements of an English patent. They were brought to England, in order to be put on board a ship of war belonging to the Mikado, and the patentee obtained an injunction against the agents of the Mikado and the persons in whose custody the shells were, restraining them from removing the shells. The Mikado then applied to be, and was, made a defendant in the suit. An order was made by Sir George Jessel, Master of the Rolls, and affirmed by the Court of Appeal, that notwithstanding the injunction, the Mikado should be at liberty to remove the shells. Lord Justice James said: "I am of opinion that this attempt on the part of the plaintiff to interfere with the right of a foreign sovereign to deal with his public property is one of the boldest I have ever heard of as made in any court in this country." And, after stating the contention of the plaintiff that the shells were in the possession of persons in England who were minded to make, and did make, a use of them inconsistent with his patent, he further said: "If they were doing so, then they are liable in an action for damages, and the plaintiff may recover any damages that he may be entitled to. But that does not interfere with the right of the sovereign of Japan, who now asks to be allowed to take his property." Lord Justice Brett said: "The goods were the property of the Mikado. They were his property as a sovereign; they were the property of his country; and therefore he is in the position of a foreign sovereign having property here." "If it is an infringement of the patent by the Mikado, you cannot sue him for that infringement. If it is an infringement by the agents, you may sue the agents for that infringement, but then it is the agents whom you sue." "The Mikado has a perfect right to have these goods; no court in this country can properly prevent him from having goods which are the public property of his own country."

In the case of *The Parlement Belge*, 5 P. D. 197, the Court

of Appeal held that an unarmed packet, belonging to the King
of the Belgians, and in the hands of officers commissioned by
him, and employed in carrying mails, and also in carrying
merchandise and passengers for hire, was not liable to be seized
in a suit *in rem* to recover damages for a collision. Lord Jus-
tice Brett, in a considered judgment, stated the real question
to be " whether every part of the public property of every
sovereign authority in use for national purposes is not as much
exempt from the jurisdiction of every court as is the person of
every sovereign ; " and, after reviewing many American as well
as English cases, announced the conclusion of the court thus :
" As a consequence of the absolute independence of every
sovereign authority, and of the international comity which
induces every sovereign State to respect the independence of
every other sovereign State, each and every one declines to
exercise by means of any of its courts any of its territorial
jurisdiction over the person of any sovereign or ambassador of
any other State, or over the public property of any State which
is destined to its public use, or over the property of any am-
bassador, though such sovereign, ambassador, or property be
within its territory, and therefore, but for the common agree-
ment, subject to its jurisdiction. This proposition would de-
termine the first question in the present case in favor of the
protest, even if an action *in rem* were held to be a proceeding
solely against property, and not a procedure directly or indi-
rectly impleading the owner of the property to answer to the
judgment of the court. But we cannot allow it to be supposed
that in our opinion the owner of the property is not indirectly
impleaded." After stating the mode of procedure in courts of
admiralty, he continued : " To implead an independent sover-
eign in such a way is to call upon him to sacrifice either his
property or his independence. To place him in that position
is a breach of the principle upon which his immunity from
jurisdiction rests. We think that he cannot be so indirectly
impleaded, any more than he could be directly impleaded. The
case is, upon this consideration of it, brought within the general
rule that a sovereign authority cannot be personally impleaded
in any court."

It was argued at the bar that the petition of right in England

was in effect a suit against the crown. But the petition of right could never be maintained except after an application to the King and his consent granted. The sovereign thus retained the power of determining in advance in every case whether it was consistent with the public interests to allow the suit to be brought and tried in the ordinary courts of justice. The petition might be presented either to the King in person, or in Parliament; and if sued in Parliament, it might be enacted and pass as an act of Parliament. Staunf. Prerog. 72 *b;* Chit. Prerog. 346. The old form of proceeding by petition of right to the King was so tedious and expensive that it fell into disuse; and there is hardly an instance in which it was resorted to in England between the settlement of the colonies and the Declaration of Independence, or for half a century afterwards. *Clayton* v. *Attorney-General,* 1 Coop. *temp.* Cottenham, 97, 120 ; *The Queen* v. *Powell,* 1 Q. B. 353, 363, and 4 Per. & Dav. 719, 723, above quoted; *Canterbury* v. *Attorney-General,* 1 Phillips, 306, 327; *De Bode's Case,* 8 Q. B. 208, 273. The granting of the royal consent as a matter of course is but of very modern introduction in England. *Eastern Archipelago Co.* v. *The Queen,* 2 El. & Bl. 856, 914. And the statute of 23 & 24 Vict., c. 34, simplifying and regulating the proceedings, makes it the duty of the Secretary of State for the Home Department to lay the petition before the Queen for her consideration, and to give her his advice upon it; and if upon his advice she refuses to grant her fiat, the suppliant is without remedy. *Irwin* v. *Grey,* 3 F. & F. 635, 637 ; *Tobin* v. *The Queen,* 14 C. B. N. s. 505, 521, and 16 id. 310, 368. In *United States* v. *O'Keefe,* 11 Wall. 178, 184, in which it was held that British subjects were included in the act of Congress of July 27, 1868, c. 276, allowing suits for the proceeds of captured and abandoned property to be brought in the Court of Claims " by aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government in its courts," this court, speaking of the English petition of right, said : " It is easy to see that cases might arise, involving political considerations, in which it would be eminently proper for the sovereign to withhold his permission."

The English remedies of petition of right *monstrans de droit,*

and traverse of office, were never introduced into this country as part of our common law; but in the American Colonies and States claims upon the government were commonly made by petition to the legislature. The inadequacy or the want of those remedies is no reason for maintaining a suit against the sovereign, in a form which is usual between private citizens, but which has not been expressly granted to them as against the sovereign. *The Queen* v. *Powell*, above quoted; *Gibbons* v. *United States*, 8 Wall. 269.

In particular classes of cases, indeed, Congress has authorized suits in equity to be brought against the United States; as, for instance, in cases of delinquent receivers of public money against whom a warrant of distress has been issued, in cases of proprietors of land taken and sold to make certain improvements in the city of Washington (in which the bill is spoken of as "in the nature of a petition of right"), and in claims to share in the money received from Mexico under the treaty of Guadalupe Hidalgo. See *United States* v. *Nourse*, 6 Pet. 470, and 9 id. 8; *Murray* v. *Hoboken Land Co.*, 18 How. 272, 284; *Van Ness* v. *Washington*, 4 Pet. 232, 276, 277; *Clark* v. *Clark*, 17 How. 315, 320. So it has often authorized suits to be brought against the United States to confirm claims, under grants from foreign governments, to lands since ceded to the United States. But in such a suit Chief Justice Marshall said: "As the United States are not suable of common right, the party who institutes such suit must bring his case within the authority of some act of Congress, or the court cannot exercise jurisdiction over it." *United States* v. *Clarke*, 8 Pet. 436, 444.

For more than sixty years after the adoption of the Constitution, no general provision was made by law for determining claims against the United States; and in every act concerning the Court of Claims Congress has defined the classes of claims which might be made, the conditions on which they might be presented, the forms of proceeding, and the effect to be given to the awards. The act of Feb. 24, 1855, c. 122, which first established that court, required an act of Congress to carry out each award. The act of March 3, 1863, c. 92, which dispensed with that requirement, authorized the sums due by the judgments of the Court of Claims, after presentation of a copy

thereof to the Secretary of the Treasury and his estimate of an appropriation therefor, to be paid out of any general appropriation made by law for the satisfaction of private claims. Even under this act the Court of Claims had so little of the nature of a judicial tribunal, that this court declined to entertain appeals from its decisions, although the statute expressly gave such an appeal. *Gordon* v. *United States*, 2 Wall. 561; s. c. 5 Am. Law Reg. N. s. 111. It is only since the act of March 17, 1866, c. 19, has repealed the provision which by necessary implication authorized the Secretary of the Treasury to revise the decisions of the Court of Claims, and of this court on appeal, that this court has considered and determined such appeals.

· Under the existing statutes, the principal classes of demands submitted to the determination of the Court of Claims are claims founded on laws of Congress, on regulations of the executive departments, and on contracts, expressed or implied, and claims referred to the court by Congress. Rev. Stat., sect. 1059. The proceeding by petition to Congress and reference by Congress to the Court of Claims presents the nearest analogy that our law affords to the petition of right. No act of Congress has conferred upon that court, or upon any other tribunal, general jurisdiction of suits against the United States to recover possession of real property, or to redress a tort. And the act of Congress of June 11, 1864, c. 117 (re-enacted in sect. 3753 of the Revised Statutes), authorizing the Secretary of the Treasury to direct a stipulation, to the extent of the value of the interest of the United States, to be entered into for the discharge of any property owned or held by the United States, or in which the United States have or claim an interest, which has been seized or attached in any judicial proceeding under the laws of a State, expressly provides " that nothing herein contained shall be considered as recognizing or conceding any right to enforce by seizure, arrest, attachment, or any judicial process, any claim against any property of the United States, or against any property held, owned, or employed by the United States, or by any department thereof, for any public use, or as waiving any objection to any proceeding instituted to enforce any such claim."

In *Gibbons* v. *United States,* 8 Wall. 269, which was an attempt to maintain in the Court of Claims a suit against the government as upon an implied contract, for unauthorized acts of its officers which were in themselves torts, the court said : " The supposition that the government will not pay its debts, or will not do justice, is not to be indulged ; " and, after stating the reasons against the maintenance of the suit, concluded : " These reflections admonish us to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the general government, though they may have been committed while serving that government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a remedy, Congress has wisely reserved the matter for its own determination." In *Langford* v. *United States,* 101 U. S. 341, the remarks just quoted were repeated, and were applied to the case of a suit for the use and occupation of land which the United States, under a claim of title, had, through its Indian agents, taken possession of and since held by force and against the will of the rightful owner.

If it is proper that the United States should allow themselves to be sued in such a case as this, public policy requires that it should rest with Congress to define the mode of proceeding, the conditions on which it may be maintained, and the manner in which the decision shall be enforced, — none of which can be done if the citizen has an absolute right to maintain the action.

If the plaintiff is entitled to judgment, it can only be upon the ground that the United States are not a party to the record, and have no such relation to the action that their possession of the land demanded will prevent judgment against the defendants of record. If those defendants alone are to be held to be parties or interested, the plaintiff is entitled, as of right, to immediate execution as well as to judgment ; and the court has no discretion to stay an execution between private parties on considerations of the interests of the public.

To maintain this action, independently of any legislation by Congress, is to declare that the exemption of the United States from being impleaded without their consent does not embrace

lands held by a disputed title; to defeat the exemption from judicial process in the very cases in which it is of the utmost importance to the public that it should be upheld; and to compel the United States to submit to the determination of courts and juries the validity of their title to any land held and used for military, naval, commercial, revenue, or police purposes.

The decision of this court and the reasoning of the several judges in the case of *Chisholm* v. *Georgia,* 2 Dall. 419, in which a majority of the court held that under the Constitution, as originally adopted, a suit could be maintained in this court against a State by a citizen of another State, do not appear to us to furnish much aid in the determination of this case, for several reasons: 1st, Each of the judges who mentioned the subject declined to affirm that the United States could be sued. 2 Dall. 430, 469, 478.   2d, The decision was based on a construction of the words of the Constitution conferring jurisdiction of suits between " a State and citizens of another State." 3d, That construction was set aside by the Eleventh Amendment of the Constitution, which declares that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." 2 Dall. 480, note; *Hollingsworth* v. *Virginia,* 3 Dall. 378.

In those cases in which judgments have since been rendered by this court against individuals concerning money or property in which a State had an interest, either the money was in the personal possession of the defendants and not in the possession of the State, or the suit was to restrain the defendants by injunction from doing acts in violation of the Constitution of the United States.   Within one or both of these classes fall the cases of *United States* v. *Peters*, 5 Cranch, 115; *Osborn* v. *Bank of United States*, 9 Wheat. 738; *Davis* v. *Gray*, 16 Wall. 203; and *Board of Liquidation* v. *McComb*, 92 U. S. 531.

In *United States* v. *Peters*, 5 Cranch, 115, in which a writ of *mandamus* was ordered to a District Court of the United States sitting in admiralty to issue an attachment against the executrixes of David Rittenhouse to enforce obedience to a de-

cree of that court for the payment of money (although Rittenhouse had been treasurer of the State of Pennsylvania, and the legislature of that State had directed its Attorney-General to sue the executrixes for the recovery of the money, and the Governor to protect them against any process of the Federal courts), the judgment of this court, as stated by Mr. Chief Justice Marshall, went upon the ground that it was apparent that Rittenhouse held the money in his own right, and that " the suit was not instituted against the State or its treasurer, but against the executrixes of David Rittenhouse, for the proceeds of a vessel condemned in the Court of Admiralty, which were admitted to be in their possession. If these proceeds had been the actual property of Pennsylvania, however wrongfully acquired, the disclosure of that fact would have presented a case on which it is unnecessary to give an opinion; but it certainly can never be alleged that a mere suggestion of title in a State to property, in possession of an individual, must arrest the proceedings of the court, and prevent their looking into the suggestion, and examining the validity of the title." The Chief Justice stated the conclusion of the court as follows: " Since, then, the State of Pennsylvania had neither possession of, nor right to, the property on which the sentence of the District Court was pronounced, and since the suit was neither commenced nor prosecuted against that State, there remains no pretext for the allegation that the case is within that amendment of the Constitution which has been cited; and, consequently, the State of Pennsylvania can possess no constitutional right to resist the legal process which may be directed in this cause."

The Chief Justice thus carefully avoided expressing an opinion upon a case in which the money sued for was in the possession of the State, or " the actual property of the State, however wrongfully acquired; " and his remark upon the effect of a mere suggestion of title in the State in a suit to recover " property in possession of an individual," as well as his similar remark in *Osborn* v. *Bank of United States*, 9 Wheat. 738, 870, as to the effect of a suggestion of title in a foreign sovereign under like circumstances, can have no application where it is in due form pleaded or suggested, and satisfactorily

proved or admitted, that the property is in the possession of the
State or the sovereign, under claim and color of title, though
that possession is necessarily held in its behalf by its officers or
servants, as appears by his own judgment in the case of *The
Exchange*, as well as by the cases in the Court of Exchequer,
before cited.

In *Osborn* v. *Bank of United States*, 9 Wheat. 738, the bill
was originally filed by the Bank of the United States against
the auditor of the State of Ohio and a collector employed by
him, to prevent them from levying a tax imposed by the legis-
lature of that State in violation of the Constitution of the
United States upon the property of the bank; and they, after
the service of the subpœna, forcibly took from the plaintiff's
office the amount of the tax in money, and paid it over to the
treasurer of the State, who received it with notice of these
facts, and kept it apart from other money belonging to the
State, so that, in the view taken by the court, it had never
come into the possession of the State, but could have been
recovered from the treasurer in an action of detinue.    9 Wheat.
833–836, 854, 858.    By an amendment of the bill the treas-
urer was made a defendant.    Such were the facts upon which the
court, by one of Mr. Chief Justice Marshall's most elaborate
judgments, in which the case was admitted to be one of great
difficulty, ordered the defendants to restore the money, and
held that the fact that the State was not, and could not be,
without its consent, made a defendant, afforded no objection to
granting such relief.

The dictum of the learned justice who delivered the opinion
in *Davis* v. *Gray*, 16 Wall. 203, 220, that in *Osborn* v. *Bank of
United States* it was decided that, in cases in which a State is
concerned, " that it cannot be made a party is a sufficient
reason for the omission to do it, and the court may proceed to
decree against the officers of the State in all respects as if the
State were a party to the record," overstates the decision in
Osborn's case ; goes beyond what was required for the decision
of *Davis* v. *Gray*, in which the object of the suit and the whole
effect of the decree were to prevent the Governor and the
Commissioner of the General Land-Office of the State of Texas
from signing patents for lands of which the plaintiff had the

title under a previous grant from the State; and, as the State cannot hold money or property otherwise than by its officers and agents, would, if understood as laying down a universal rule, practically nullify the Eleventh Amendment of the Constitution.

In *Board of Liquidation* v. *McComb*, 92 U. S. 531, in which an injunction was granted to restrain the Board of Liquidation, consisting of the Governor and other officers, of the State of Louisiana from issuing or using, in violation of a previous contract of the State with the plaintiff, bonds of the State in their hands, the court said that the objections to proceeding by injunction were, "first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter." And the ground upon which the bill in that case, as well as in the previous cases of *Osborn* v. *Bank of United States* and *Davis* v. *Gray*, was sustained, was defined to be, that when a plain official duty, requiring no exercise of discretion, is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it, notwithstanding the officer pleads the authority of an unconstitutional, and therefore void, law for the violation of his duty.

The case of *The Governor of Georgia* v. *Madrazo*, 1 Pet. 110, does not appear to us to have any important bearing, except as tending to illustrate the distinction between the possession of the State by its agents, and the possession of the agents in their own right. The decision was, that where negro slaves were illegally taken from the owner on the high seas, and afterwards sold to a stranger, who, without the privity of the owner, imported them into the United States in violation of the act of Congress of March 2, 1807, c. 22, and they were here seized by an officer of the customs of the United States, and delivered to an agent appointed by the Governor of the State of Georgia in conformity with the act of Congress, and some

of them sold by order of the Governor of the State, and the money obtained at the sale was, in the words of Mr. Chief Justice Marshall, "actually in the Treasury of the State, mixed up with its general funds," and the rest of the slaves remained in the hands of the agent of the State, "in possession of the government," a libel in admiralty by the owner to recover possession of the money and slaves, though not brought against the State by name, but against the Governor in his official capacity, was a suit against the State, and therefore, by reason of the Eleventh Amendment of the Constitution, could not be maintained. See also *Ex parte Madrazzo*, 7 Pet. 627.

In the case, on which the plaintiff principally relies, of *Meigs* v. *M'Clung*, 9 Cranch, 11, in which a Circuit Court of the United States, and this court on writ of error, gave judgment for the plaintiff in an action of ejectment for land held by the defendants as officers and under the authority of the United States, the full statement of their position in the bill of exceptions, on page 13 of the report, clearly shows that the fact that they so held the land was not set up in defence, except as supplemental to the position that the legal title to the land was in the United States; and it does not appear to have been mentioned in argument. No objection to the exercise of jurisdiction was made by the defendants or by the United States, or noticed by the court. That the court understood the United States to desire a decision upon the merits is further apparent from Mr. Chief Justice Marshall's summary towards the close of the opinion, "The land is certainly the property of the plaintiff below; and the United States cannot have intended to deprive him of it by violence and without compensation." Had the decision covered the question of jurisdiction, the Chief Justice would hardly have omitted to refer to it in *Osborn* v. *Bank of United States*, above stated.

In *Wilcox* v. *Jackson*, 13 Pet. 498, in *Brown* v. *Huger*, 21 How. 305, and in *Grisar* v. *McDowell*, 6 Wall. 363, which were also actions of ejectment against officers of the United States, the judgments were in favor of the defendants on the merits, no suggestion that the United States were so interested that the action could not be maintained was made by counsel or passed upon by this court, and that the court has not hitherto under-

stood any such question to be settled by any or all of those cases is clearly shown by its more recent judgments.

In the case of *The Siren*, 7 Wall. 152, the court said : " It is a familiar doctrine of the common law, that the sovereign cannot be sued in his own courts without his consent. The doctrine rests upon reasons of public policy ; the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition of the means required for the proper administration of the government. The exemption from direct suit is therefore without exception. This doctrine of the common law is equally applicable to the supreme authority of the nation, — the United States. They cannot be subjected to legal proceedings at law or in equity without their consent ; and whoever institutes such proceedings must bring  his case within the authority of some act of Congress.   Such is the language of this court in *United States* v. *Clarke*, 8 Pet. 444.   The same exemption from judicial process extends to the property of the United States, and for the same reasons.   As justly observed by the learned judge who tried this case, there is no distinction between suits against the government directly, and suits against its property."

In the case of *The Davis*, 10 Wall. 15, the court, stating the doctrine somewhat less broadly, yet affirmed the proposition, as clearly established by authority, that " no suit *in rem* can be maintained against the property of the United States when it would be necessary to take such property out of the possession of the government by any writ or process of the court ; " and in discussing the question, what constitutes a possession which protects the property from the process of the court, said : " We are speaking now of a possession which can only be changed under process of the court by bringing the officer of the court into collision with the officer of the government, if the latter should choose to resist.   The possession of the government can only exist through some of its officers, using that phrase in the sense of any person charged on behalf of the government with

the control of the property, coupled with its actual possession. This, we think, is a sufficiently liberal definition of the possession of the property by the government to prevent any unseemly conflict between the court and the other departments of the government, and which is consistent with the principle which exempts the government from suit and its possession from disturbance by virtue of judicial process."

In *The Siren*, a claim for damages against a prize ship for a collision on her way from the place of capture to the port of adjudication, was allowed out of the proceeds of her sale upon condemnation, because the government was the actor in the suit to have her condemned.   In *The Davis*, a claim was allowed for salvage of goods belonging to the United States in the hands of the master of a private vessel as a common carrier, because his possession was not the possession of the United States, and the United States could only obtain the goods by coming into court as claimant and actor.   Each of those cases, as was pointed out in *Case* v. *Terrell*, 11 Wall. 199, 201, was decided upon the ground that " the government came into court of its own volition to assert its claim to the property, and could only do so on condition of recognizing the superior rights of others."

In *Carr* v. *United States*, 98 U. S. 433, in which it was decided that judgments in ejectment against officers of the government, in possession in its behalf of lands held for a marine hospital, did not bind nor estop the United States, it was said, in the opinion of the court: " We consider it to be a fundamental principle that the government cannot be sued except by its own consent; and certainly no State can pass a law which would have any validity, for making the government suable in its courts.   It is conceded in *The Siren*, 7 Wall. 152, and in *The Davis*, 10 id. 15, that without an act of Congress no direct proceeding can be instituted against the government or its property.   And in the latter case it is justly observed that ' the possession of the government can only exist through its officers; using that phrase in the sense of any person charged on behalf of the government with the control of the property, coupled with actual possession.'   If a proceeding would lie against the officers as individuals in the case of a marine hospi-

tal, it might be instituted with equal facility and right in reference to a post-office or a custom-house, a prison or a fortification.   In some cases (perhaps it was so in the present case) it might not be apparent until after suit brought that the possession attempted to be assailed was that of the government ; but when this is made apparent by the pleadings, or the proofs, the jurisdiction of the court ought to cease.   Otherwise, the government could always be compelled to come into court and litigate with private parties in defence of its property."

The view on which this court appears to have constantly acted, which reconciles all its decisions, and is in accord with the English authorities, is this : The objection to the exercise of jurisdiction over the sovereign or his property, in an action in which he is not a party to the record, is in the nature of a personal objection, which, if not suggested by the sovereign, may be presumed not to be intended to be insisted upon.   If ejectment is brought by one citizen against another, the court *prima facie* has jurisdiction of the subject-matter and of the parties, and, if no objection is interposed in behalf of the sovereign, proceeds to judgment between the parties before it.   If the property is in the possession of the defendants and not of the sovereign, an informal suggestion that it belongs to the sovereign will not defeat the action.   But if the sovereign, in proper form and by sufficient proof, makes known to the court that he insists upon his exemption from suit, and that the property sued for is held by the nominal defendants exclusively for him and on his behalf as public property, the right of the plaintiff to prosecute the suit and the authority of the court to exercise jurisdiction over it cease, and all further proceedings must be stayed.

In the case at bar, the United States interposed in the most solemn and appropriate manner.   The Attorney-General, before the trial, following the course approved by this court in the case of *The Exchange,* and by the Court of Exchequer in the case of *Doe* v. *Roe,* and other cases, already referred to, filed a suggestion and motion in writing, in which, appearing only for this purpose, he states that the land has been for more than ten years, and still is, held, occupied, and possessed by the United States, through their officers and agents charged in behalf of

the government of the United States, with the control of the property, and who are in the actual possession thereof, as public property of the United States for public uses, in the exercise of their sovereign and constitutional powers, as a military station, and as a national cemetery established for the burial of deceased soldiers and sailors, known as the Arlington Cemetery, and for war, military, charitable, and educational purposes, as set forth in the certificate of sale of the land for non-payment of direct taxes lawfully assessed thereon, a copy of which is annexed to the suggestion. Wherefore, without submitting the rights of the government of the United States to the jurisdiction of the court, but insisting that the court has no jurisdiction of the subject in controversy, he moves that the declaration may be set aside, and all the proceedings be stayed and dismissed, and for such other order as may be proper. The plaintiff, by demurring to this suggestion, admitted the truth of the facts stated by the Attorney-General.

After these facts had been thus formally brought to the notice of the court by the chief law officer of the United States, and had been admitted by the plaintiff, we are of opinion that the court had no authority to proceed to trial and judgment; because the suit, which had been commenced against the individual defendants, was thenceforth prosecuted against the United States; because in ejectment, as in other actions at law, a court has no authority to render a judgment on which it has no power to issue execution; because, as was directly adjudged in *Carr* v. *United States*, 98 U. S. 433, above cited, no judgment against the defendants can bind or estop the United States; because the possession of the defendants is in fact and in law the possession of the United States, and the defendants may at any moment be displaced and removed by the executive, and other custodians appointed and installed in their stead; because to issue an execution against them would be to issue an execution against the United States, and to turn the United States out of possession of land held by the United States, under claim of title and color of right for public purposes; and because to maintain a suit which has that object and that result is to violate the fundamental principle that the sovereign cannot be sued without its consent, and to encroach

upon the powers intrusted by the Constitution to the legislative and executive departments of the government.

The court having no authority to proceed with the suit, the judgment afterwards rendered for the plaintiff was erroneous. The United States, having the right to interpose, and having interposed in due form, had an equal right to sue out a writ of error to make their interposition effectual. This is plainly shown by the case of *The Exchange*, 7 Cranch, 120, 147, before cited. It follows that upon the writ of error sued out by the United States the judgment below should be reversed, and the case remanded with directions to set aside the verdict and to dismiss the action.

As to Kaufman and Strong, the court erred in compelling them to proceed to trial after the interposition of the United States ; and in declining to instruct the jury, as they requested, that if the United States, through their officers and agents charged with the control of the same, were in the possession of the property in controversy, using it as a national cemetery for the burial of deceased soldiers, and as a fort and military reservation, claiming title under the certificate of sale proved in the case, and the defendants occupied the same only as such officers and agents, in obedience to orders of the War Department of the United States, and making no claim of right to the title or possession except as such officers, the verdict must be for the defendants. Judgment of reversal should therefore also be entered upon the writ of error sued out by them.

Being of opinion, for the reasons above set forth, that the question of the validity of the title, under which the United States, through their officers and agents, hold the land, cannot be tried and determined in this action, we of course express no opinion upon that branch of the case.