Karen R. Baker, Justice, dissenting.
Justice Hart's dissent ably sets out many of the flaws in the majority's opinion in Andrews , and I join it. However, I write separately to point out the problems inherent in the broad sweeping language employed by the majority in Andrews . In overruling decades of precedent, the majority in Andrews held that "... [W]e interpret the constitutional provision, The State of Arkansas shall never be made a defendant in any of her courts, precisely as it reads. The drafters of our current constitution removed language from the 1868 constitution that provided the General Assembly with statutory authority to waive sovereign immunity and instead used the word 'never.' See Ark. Const. of 1868, art. 5, § 45; Ark. Const. art. 5, § 20." If "never" does indeed mean never, as the majority held in Andrews , and made means cause to become-rather than compelled, as I contended in my dissent in Andrews is the correct interpretation-then this must be the law for everyone, all of the time. The majority is not free to pick and choose when it will apply. "Never" does not mean unless an attorney for the state has failed to raise the issue, as the majority held in Walther v. Flis Enterprises Inc. , 2018 Ark. 64, 540 S.W.3d 264, nor can it mean unless authorized by the judicial branch or the executive branch rather than the legislative branch. Likewise, "never" cannot mean except when not ruled on by the circuit court below. The definition of "never" is "at no time" Merriam-Webster's Collegiate Dictionary (9th ed.) (1991), or "not ever; on no occasion; at no time" American Heritage Dictionary (4th ed.) (2000). Thus, because the *844 Arkansas Supreme Court is a "court" established by the Arkansas Constitution, the State of Arkansas cannot be caused to become a defendant in this court, by this court, or in any other Arkansas court under the reasoning employed by the majority in Andrews . Such an interpretation clearly conflicts with other provisions of the constitution which is a fact the majority conveniently chose to ignore in Andrews .
Then only twenty-three days after the mandate issued in Andrews , the majority abandoned the holding of that case, and in Walther , without distinguishing Andrews or doing a proper Constitutional analysis, held that sovereign immunity was waived by the attorney for the State. Now, again without a proper constitutional analysis, the majority returns to the holding in Andrews to dismiss Barnes' case. While I recognize this is the logical result dictated by the majority's holding in Andrews , I cannot agree that it is a correct analysis of the Arkansas constitution.
Accordingly, I dissent from the majority opinion.
Hart, J., joins.
Josephine Linker Hart, Justice, dissenting.
The majority's discussion and disposition of this case deprives Annette Barnes, and hereafter all the people of this state, of access to their state courts to redress wrongs perpetrated at the hands of the state government. The majority asserts that its decision in Board of Trustees of University of Arkansas v. Andrews , 2018 Ark. 12, 535 S.W.3d 616 compels this conclusion. In Andrews , the majority held that article 5, section 20 of the Arkansas Constitution, which provides that "[t]he State of Arkansas shall never be made defendant in any of her courts," prevents the General Assembly from passing a law allowing the State to be sued in a state court, couching its decision in terms of "sovereign immunity." Andrews, supra. However, the court reached this decision by failing to perform an adequate constitutional analysis.
When this court interprets a constitutional provision, it must analyze each individual provision of the constitution alongside the others contained therein. See Ward v. Priest , 350 Ark. 345, 382, 86 S.W.3d 884, 898 (2002) ("It is a rule of universal application that the Constitution must be considered as a whole, and that, to get the meaning of any part of it, we must read it in the light of other provisions relating to the same subject."). Every legislative act carries a strong presumption of constitutionality. Ark. Dep't of Corr. v. Bailey , 368 Ark. 518, 247 S.W.3d 851 (2007). The party challenging a statute's constitutionality bears the burden of proving that the statute is unconstitutional, and all doubts will be resolved in favor of the statute's constitutionality. See City of Cave Springs v. City of Rogers , 343 Ark. 652, 37 S.W.3d 607 (2001). A statute will be struck down only when there is a clear incompatibility between the statute and the constitution. Id.
The Andrews majority ignored the facts that article 2 guarantees every citizen a judicial remedy for wrongs suffered at the hands of the State, and that article 2 prohibits the State from using article 5, section 20 as a shield against accountability for violating the rights guaranteed by article 2. Today, this court should overturn Andrews ; instead, the majority holds that the General Assembly is constitutionally incapable of abrogating its own sovereign immunity and that the Arkansas Whistle-Blower Act (the "AWBA"), codified at Arkansas Code Annotated §§ 21-1-601 et seq., is an example of such unconstitutional legislative abrogation. This rationale would *845 effectively strike down the
AWBA, which provides State employees a cause of action against their employers when those employees are brave enough to speak out against unlawful or wasteful practices on the part of their employers and are then subjected to adverse employment consequences for having done so.
I. Sovereign Immunity and Article 5, Section 20 of the 1874 Arkansas Constitution
Sovereign Immunity holds an interesting place in the American legal system. Hailing from pre-colonial England, it is said to be rooted in the Latin phrase rex non potest peccare : "the king can do no wrong." The principle is generally understood to stand for the proposition that the sovereign cannot be sued unless it has specifically consented to suit. Obviously, there is no "king" of the United States of America; in fact, this country fought the Revolutionary War to rid itself of such a regime. Accordingly, some consider sovereign immunity an "anachronistic relic" that should be "eliminated from American law." Erwin Chemerinsky, Against Sovereign Immunity , 53 Stan. L. Rev. 1201, 1201-02 (2001). Even so, the doctrine of sovereign immunity has lived on in this country through its application by the courts. As the United States Supreme Court has observed, "[T]he principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine." United States v. Lee , 106 U.S. 196, 207, 1 S.Ct. 240, 27 L.Ed. 171 (1882). Under either pre-colonial England's conception of sovereign immunity[1] or that which has been afforded to the individual States of this country[2] , the "sovereign" has the absolute authority to waive its immunity, if it wishes to do so.
The phrase "sovereign immunity" does not appear in the Arkansas Constitution. However, the Arkansas Supreme Court has confounded the concept of sovereign immunity with article 5, section 20 of the Arkansas Constitution, which provides that "(t)he State of Arkansas shall never be made defendant in any of her courts." In both Andrews and the case-at-bar, the majority latches on with a death grip to these fourteen words, elevating them above the remainder of the Arkansas Constitution, and opines that harms committed by State actors against the people of this State are shielded from accountability by "sovereign immunity." Further, the majority holds *846 that
article 5, section 20 prohibits the General Assembly from abrogating that immunity to facilitate redress of the harms inflicted by those State actors upon the people. This holding evinces a complete lack of understanding of sovereign immunity as a general matter, and amounts to a studied indifference to all other provisions of the Arkansas Constitution, as well as our rules for interpreting the same. Article 5, section 20 is by no means the mechanism that affords the State of Arkansas sovereign immunity; instead, it is simply one single provision found in the legislative article (article 5) of the Arkansas Constitution that must be interpreted alongside each of the other provisions contained throughout the same constitution.
Over the years, this court has acknowledged what it describes as "sovereign immunity," pointing to article 5, section 20, but our opinions on this subject have not yielded any consistently enforceable rule for purposes of stare decisis. Some of our cases suggest that article 5, 20 means the State of Arkansas cannot be sued in an Arkansas state court under any circumstances whatsoever. See, e.g. , Ark. State Highway Comm'n v. Nelson Bros. , 191 Ark. 629, 634, 636, 87 S.W.2d 394, 396 (1935) ("The language of the quoted prohibition is so precise and clear as to admit of no room for interpretation or for any refinement of judicial construction which would obscure or change the common and ordinary meaning of the words employed.... No one has a vested right to sue the state even when that privilege may be, and has been, given[.]"). Other cases have suggested that there are three exceptions to article 5, section 20 : (1) when the State is the moving party seeking specific relief, (2) when a plaintiff seeks to enjoin a state official from acting unlawfully, and (3) when an act of the legislature has created a waiver of immunity. See,
e.g. , Mitchem v. Hobbs , 2014 Ark. 233, 2014 WL 2019278. More recently, our cases have suggested that the "sovereign immunity" afforded by article 5, section 20 is an affirmative defense that can be raised or waived whenever the State is haled into court. Walther v. FLIS Enters., Inc. , 2018 Ark. 64, 540 S.W.3d 264.
In Andrews , this court held that article 5, section 20's purported conferral of sovereign immunity upon the State of Arkansas prohibits the Arkansas General Assembly from enacting any legislation that could lead to a citizen haling the State or any of its instrumentalities into a State court. Here, the majority holds that Andrews controls the outcome of this case, since Barnes's complaint, which alleges racial discrimination and unlawful retaliation, is brought pursuant to the AWBA, a product of the General Assembly.
I submit that this court's prior decisions discussing article 5, section 20 are in irreconcilable conflict, and that Andrews only compounded that conflict. As discussed in greater detail herein, the proper resolution to this case is to simply read the applicable provisions of the 1874 Arkansas Constitution as they were written, something that the majority has failed to do in either Andrews or the case at bar. One cannot read article 5, section 20 in isolation. Instead, as noted above, one must analyze each individual provision of our constitution alongside the others contained therein. See Ward, supra. When one appropriately interprets our constitution as a whole, it is apparent that article 5, section 20 does not prevent Barnes from pursuing judicial redress of her asserted grievances in this case.
II. Suits Against the State of Arkansas
Indeed, article 5, section 20 presents an ostensibly broad premise: "[t]he State of *847 Arkansas shall never be made defendant in any of her courts." Definitively, however, the drafters did not intend this provision to operate as a total bar to all lawsuits against the State. We know this because the drafters wrote many provisions into the very same constitution creating scenarios in which the State would most assuredly be (and has most assuredly been) sued.
We note that article 2, section 22 allows Arkansas citizens to hale the State into court to demand "just compensation" for property taken by the State. See, e.g. , Bachman v. State , 235 Ark. 339, 343, 359 S.W.2d 815, 817 (1962) ("The state cannot of course destroy or injure a person's private property without just compensation and without due process of law."). Additionally, article 2, section 11 provides that the "privilege of the writ of habeas corpus shall not be suspended" except by the legislature in limited circumstances, and article 7, section 49 provides that "[a]ll writs and other judicial process, shall run in the name of the State of Arkansas[.]" Still another example is found in article 16, section 13, which provides that "[a]ny citizen of any county, city or town may institute suit, in behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever."See, e.g. , McGhee v. Ark. State Bd. of Collection Agencies , 360 Ark. 363, 372-73, 201 S.W.3d 375, 380 (2005) ("According to Ark. Const. Art. 5, section 20, 'The State of Arkansas shall never be made a Defendant in any of her Courts.' While this provision generally prohibits suits against the State or a state agency, we have held that the illegal-exaction clause, as the more specific provision, controls the more general prohibition against suit provided in art. 5, § 20, and grants taxpayers the right to sue."). Plainly, the drafters did not intend for the State to be forever immune from suit in its courts.
The majority in Andrews , without any factual justification, supported its decision by insisting that its analysis comported with the historical data surrounding the drafting of the 1874 Constitution. The majority then only made a facial comparison between article 5, section 20 of the 1874 Constitution and article 5, section 45 of the 1868 Constitution. The 1868 version provided that "[t]he general assembly shall direct by law in what manner and in what courts suits may be brought by and against the state," while the 1874 version provides that "[t]he State of Arkansas shall never be made defendant in any of her courts." The majority held that the distinction between article 5, section 45 of the 1868 Constitution and article 5, section 20 of the 1874 Constitution necessarily indicates that the drafters of the latter version intended to prevent any legislatively approved action against the State in a court of law. However, in both Andrews and the case at bar, the majority declines to account for the actual historical context in which the 1874 Constitution was ratified, and altogether fails to consider another far more important distinction between the 1868 and 1874 Arkansas Constitutions: the Declaration of Rights contained in article 2 of the 1874 Constitution.
The years between 1863 and 1874 encapsulate a tumultuous period in our State's history. There are different ways to view our state's history during the war years and our state's subsequent military occupation. However, there can be no dispute that the Arkansas state government was known during the Reconstruction Era for fraud, cronyism, martial law, disenfranchisement, and other abuses of government power. Thus, when Arkansas ratified its current constitution in 1874, it included numerous provisions to protect the individual rights and liberties of the people, and to prevent the government, specifically, *848 from infringing upon those same rights and liberties.
III. Article 2's Declaration of Rights
Article 2 of the 1874 Arkansas Constitution sets out a "Declaration of Rights" specifically reserved and retained by the people of this State. Article 2's first provisions address the people's role in relation to their state government. Article 2, section 1 dictates that "[a]ll political power is inherent in the people and government is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same, in such manner as they may think proper." Article 2, section 2 explains that "[t]o secure these rights[,] governments are instituted among men, deriving their just powers from the consent of the governed." Article 2 then sets forth many principles with respect to the rights and freedoms enjoyed by Arkansas citizens, and exempts those rights and freedoms from the authority delegated to the state government.
For example, and of particular significance with respect to the AWBA, article 2, section 6 (the "Free Speech" clause) provides that "[t]he free communication of thoughts and opinions, is one of the invaluable rights of man." Equally significant with respect to Barnes's AWBA claim, which alleges racially discriminatory actions on the part of the
State, is article 2, section 3 (the "Equality Clause"), which provides that "[t]he equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, on account of race, color or previous condition."
Additionally, it is plainly apparent from the language of article 2 that the drafters intended to protect the people's ability to pursue these rights and principles, specifically through courtroom litigation. Article 2, section 13 (the "Legal Remedy Clause") provides that "[e]very person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character; he ought to obtain justice freely, and without purchase; completely, and without denial; promptly and without delay; conformably to the laws." Article 2, section 4 (the "Petition Clause") provides that the people's right "to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged."[3] Furthermore, *849 article 2, section 7 (the "Jury Trial
Clause") provides that "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law.... This amendment to the Constitution of Arkansas shall be self-executing and require no enabling act[.]"
Perhaps most importantly, each of the principles enumerated in article 2 supersedes all other provisions of the 1874 Arkansas Constitution. While the majority in Andrews acknowledged the distinction between article 5, section 45 of the 1868 Constitution and article 5, section 20 of the 1874 Constitution, it failed to consider another distinction that casts the latter provision in a very different light: the addition of article 2, section 29 to the 1874 Constitution. Article 2, section 29 (the "Reservation of Powers Clause"), provides as follows:
This enumeration of rights shall not be construed to deny or disparage others retained by the people; and to guard against any encroachments on the rights herein retained, or any transgression of any of the higher powers herein delegated, we declare that everything in this article is excepted out of the general powers of the government; and shall forever remain inviolate ; and that all laws contrary thereto, or to the other provisions herein contained, shall be void.
(Emphasis added). No such provision existed in the 1868 Constitution. Therefore, under the 1874 Constitution, no law or power delegated elsewhere in the 1874 Constitution can operate to counteract the principles enumerated in article 2.
When we construe each of these provisions together and apply them to the case-at-bar, there can be no argument that the drafters intended article 5, section 20 to prevent Barnes from pursuing the relief she seeks in this case. Plainly, the State cannot use article 5, section 20 to shield against accountability for violations of the rights exempted from government authority by article 2; this constitutes a "transgression of the higher powers" delegated to the State by the 1874 Constitution, specifically prohibited by article 2, section 29.
On the other hand, the AWBA directly advances the rights and principles enumerated in article 2. The AWBA protects free speech and the ability to enforce government accountability, principles that are specifically enumerated in article 2. See Ark. Const. article 2, §§ 1, 2, 6, 29. The AWBA's advancement of article 2 is particularly apparent in this case, as Barnes's complaint alleges racially discriminatory actions on the part of the State. See Ark. Const. art. 2, § 3. It is axiomatic, therefore, that article 5, section 20 cannot operate to prohibit the people, through their elected government officials, from taking action to facilitate the implementation of the principles enumerated in article 2 by enacting legislation such as the AWBA.
IV. The Claims Commission
The State would avoid this conclusion. Citing article 5, section 20, the State argues that this provision affords the State sovereign immunity and that the General Assembly is incapable of waiving that immunity, though it concedes that there are scenarios in which immunity "might" not be applicable, such as when one seeks to enjoin the state from acting unlawfully or unconstitutionally. However, the State steadfastly maintains that there can be no legal action against the state that could in any way put the state's coffers at risk. Effectively, the State, with complete disdain for any of the rights guaranteed to the people by article 2, argues that when the actions of any of its departments or employees violate the rights of its citizens in a manner that causes those citizens *850 damages, those same citizens must bear the weight of those damages without any judicially enforceable recompense.
If that result seems draconian (it inescapably is ), the majority in Andrews and the State in this case assert that so-deprived individuals have an adequate remedy with the Arkansas Claims Commission (the "Claims Commission"). The Claims Commission is a nonjudicial forum created by the General Assembly where the merits and value of any claim are within the discretion of governor-appointed and senate-confirmed commissioners. The State's argument here is entirely contradictory. It effectively amounts to "the General Assembly cannot allow Arkansas citizens to go to court where they could potentially collect money for injuries suffered at the hands of the State, so instead, let us send them to General Assembly's commission where they could potentially collect money for injuries suffered at the hands of the State."
Regardless of this argument's logical fallacy, sending these individuals to the Claims Commission does not solve the problem because this procedure unquestionably violates the rights guaranteed by the Arkansas Constitution, particularly the right to a jury trial guaranteed by article 2, section 7. This court has held that article 5, section 20 cannot supply a basis for infringing upon an individual's right to a jury trial absent a constitutional amendment specifically allowing such infringement, even if the individual could have taken his or her claim to the Claims Commission. Grimmett v. Digby , 267 Ark. 192, 193-94, 589 S.W.2d 579, 580-81 (1979) (rejecting attorney general's argument that article 5, section 20 dictated that Claims Commission had exclusive jurisdiction of plaintiff's tort claim to recover damages for vehicular accident caused by state trooper, as such a ruling would violate article 2, sections 7 and 13, absent a constitutional amendment so permitting). No such amendment exists in this case. Simply put, the very notion that the State would make this argument is contrary to any conception of a government "instituted for [the people's] protection, security and benefit[.]" Ark. Const. art. 2, § 1.
In actuality, the legislature's establishment of the Claims Commission appears to be precisely what article 5, section 20was intended to prohibit. Again, article 5 sets out the framework and procedures of the General Assembly, and it was implemented with the rest of the 1874 Constitution during a time when the State government was known for cronyism, fraud, and lack of accountability. These are the very same criticisms that have been levied against the Claims Commission, a legislatively created forum not subject to any form of judicial review. See, e.g. , Rodney A. Smolla, Politics and Due Process Don't Mix: Should the State Claims Commission be Abolished , 1986 Ark. L. Notes 43, 49 (1986) ("The Commission lacks the single most important component of the judicial function-indeed, the single most important component in the very notion of a tribunal able to dispense meaningful due process of law in an adjudicatory setting: independence."); Brief for Respondent at 5, Grimmett v. Digby , 267 Ark. 192, 589 S.W.2d 579 (1979) ("However, the
State Claims commission for years has arbitrarily and as a matter of course always denied subrogation claims filed by insurance companies."); Jason Paul Bailey, Paying the Price for Injustice: The Case for Enacting a Wrongful Conviction Compensation Statute in Arkansas , 2015 Ark. L. Notes 1814, n.32 (noting the "harsh criticism" met by the Claims Commission review committee's decision to reverse award in wrongful-imprisonment case, which characterized attorney general's arguments for reversal as "unethical tactics to fight a *851 man who is merely seeking compensation for being wrongly convicted"). One can always hope that the commissioners will pursue their responsibilities zealously and objectively, but the reality is that the Claims Commission acts as both judge and jury without any risk of actual independent judicial review.
V. Conclusion
In any case, it is absolutely ludicrous to suggest that the drafters of the 1874 Constitution, considering the context in which it was drafted, intended to guarantee the rights enumerated in article 2 and to except those rights from interference by the state government, and then simultaneously intended to take away the people's ability to judicially enforce those rights with article 5, section 20. Article 2 trumps article 5, and the AWBA is tailored to directly advance the principles enumerated in article 2, so article 5, section 20 cannot inhibit the AWBA's operation. In light of these considerations, it would seem that implementing the AWBA is exactly the sort of function the drafters of our constitution envisioned the General Assembly performing for the people of the State of Arkansas.
Instead, by looking solely to article 5, section 20 and excluding any other constitutional provision that would give it context, the majority would insulate the State from accountability for any violation of the individual rights enjoyed by the people of Arkansas, and eliminate any judicial mechanism that might be implemented to protect the same. The majority's decision inescapably violates article 2, section 29 and is therefore "void" and without effect. Ark. Const. art. 2, section 29.
The majority's refusal to even address the other provisions of the constitution finds no basis in our rules of constitutional interpretation or in the circumstances of this particular case. It is a rule of "universal application" that any constitutional analysis must interpret each specific constitutional provision alongside the other provisions of the same constitution. See Ward, supra. In fact, the State specifically argues in its brief that this court should be conducting such an analysis. See Brief of Appellant at 6, 10-15. Furthermore, the lack of detail contained in the trial court's order denying the State's motion for judgment on the pleadings supplies no basis for the majority's refusal to address the other applicable provisions of the constitution. Punishing Barnes, the appellee and prevailing party below, because the trial court did not go into great detail in rejecting an argument presented by the State, the appellant seeking reversal of the trial court's decision, is absolutely contrary to this court's jurisprudence. While this court requires an appellant to raise an issue to the trial court and to obtain a ruling on that issue before this court will address that issue on appeal, this court can affirm a trial court's decision for any legitimate reason, without regard to whether the specific reason for affirming was raised or ruled upon below. See, e.g. , Alexander v. Chapman , 299 Ark. 126, 130, 771 S.W.2d 744, 746-47 (1989) ("It also makes no difference that the trial court's decision to overrule the appellant's objection was not based on the law of the case doctrine. We will affirm the court's ruling if it is correct for any reason. The appellee was not bound to present to the trial court every conceivable reason for overruling the appellant's objection.") (internal citations omitted). In short, the majority's refusal to consider any other provisions of the constitution is entirely baseless.
In reality, the majority is attempting to walk back from the implications of Andrews . The majority "emphasize[s] here, as in Andrews , that the only issue before this *852 court is whether the General Assembly's choice to abrogate sovereign immunity in the AWBA is prohibited by the constitution. We hold that it is." The majority's efforts to limit its holding confirm that it has missed the point entirely. Barnes's AWBA claim does not turn upon whether the General Assembly can abrogate the State's sovereign immunity because she never needed any such abrogation to bring an AWBA claim in the first place. The drafters specifically excepted the provisions of article 2, which the AWBA directly advances, from inhibition by any power delegated elsewhere in the constitution. Ark. Const. art. 2, section 29.
Overall, the AWBA directly advances the rights and principles enumerated in article 2. It does not violate article 5, section 20. I would overrule Andrews , affirm the trial court's decision, and remand this case for trial.
Baker, J., joins.

Even under the pre-colonial conception of sovereign immunity, it was plain that the King had the power to subject the Crown to liability. Sir William Blackstone said the following with regard to sovereign immunity:
That the king can do no wrong, is a necessary and fundamental principle of the English constitution: meaning only, ... that in the first place, whatever may be amiss in the conduct of public affairs is not chargeable personally on the king ...; and, secondly, that the prerogative of the crown extends not to do any injury.... Whenever therefore it happens, that, by misinformation or inadvertence, the crown hath been induced to invade the private rights of any of its subjects, though no action will lie against the sovereign, ... yet the law hath furnished the subject with a decent and respectful mode of removing that invasion, by informing the king of the true state of the matter in dispute: and, as it presumes to know of an injury and to redress it are inseparable in the royal breast, it then issues as of course, in the king's own name, his orders to his judges to do justice to the party aggrieved.
William Blackstone, Commentaries on the Laws of England , Book Third 254-55 (St. George Tucker ed. 1803).

See, e.g. , Alden v. Maine , 527 U.S. 706, 755, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (an individual State's sovereign immunity "bars suits only in the absence of consent. Many States, on their own initiative, have enacted statutes consenting to a wide variety of suits.").

See James E. Pfander, Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government , 91 Nw. U. L. Rev. 899 (1997). In this article, Professor Pfander convincingly argues that the Petition Clause of the United States Constitution (the language of which, like that of the Petition Clause contained in the Arkansas Constitution, is not limited to petitions directed toward the legislature, but to the "Government" as a general matter) was intended to provide a right to pursue judicial remedies against unlawful government conduct.
This right is actually far more easily realized from Arkansas's Petition Clause, which specifically protects the right to petition "the government, or any department thereof. " Ark. Const. art. 2, section 4. The Arkansas Constitution divides the powers of government specifically among "three distinct departments , each of them to be confided to a separate body of magistracy, to-wit: Those which are legislative, to one, those which are executive, to another, and those which are judicial, to another. Ark. Const. art. 4, section 1 (emphasis added). Thus, Arkansans enjoy a constitutional right to petition an Arkansas court by "address or remonstrance." Ark. Const. art. 2, § 4. Black's Law Dictionary provides three definitions of "remonstrance": "1. A presentation of reasons for opposition or grievance. 2. A formal document stating reasons for opposition or grievance. 3. A formal complaint or protest against governmental policy, actions, or officials." Remonstrance , Black's Law Dictionary (10th ed. 2014).